## ANDERSON *v.* WHITE.

### DEED OF TRUST SALES; TRUSTEES.

1. When the terms of a deed of trust have been followed by the trustees in making sale thereunder, and no violation of duty on their part can be shown, the hardship of the condition of the grantor, hard times, scarcity of money, unpropitious time of year for selling, or the fact that the property would probably sell for much more at a later period, will not afford grounds in equity for setting aside such a sale.

2. Courts of equity will more readily interfere to prevent a sale under a deed of trust, than to set aside such a sale.

3. The discretionary powers of trustees in deeds of trust as to the time of sale and price the property shall be sold for, are more restricted than those of trustees to sell for partition or distribution and the like, the powers and duties of the former class of trustees being measured and prescribed by the deed of trust.

4. The fact that a trustee in a deed of trust after a trust sale denounces the bid of a defaulting purchaser at the sale as a trick and asks the representative of the debtor whether the debtor was the cause of it, does not show misconduct on his part sufficient to avoid a re-sale of the property; nor does the communication by the trustee to a person with whom the deed of trust debtor is negotiating for a loan to pay the trust indebtedness, of the fact that there are a number of mechanics' liens against the property, constitute misconduct on the part of the trustee which would have such an effect.

5. The fact that only two persons bid at a deed of trust sale will not justify a court of equity in setting aside the sale.

6. The charge in a bill to set aside such a sale, that the excessive cold prevented the attendance of bidders, will not in the absence of the allegation of a specific fact from which it can be determined whether or not possible bidders were reasonably prevented from attending the sale, justify equitable interference with such sale, when the bill also shows that as a matter of fact there were bidders present.

7. A deed of trust sale can properly be made in Christmas week.

8. A statement by the auctioneer at a deed of trust sale that the value of recent improvements was $3,000, whereas in fact the value was $8,000, is of no material consequence in a suit to set aside such sale when it does not appear that the mistake was not an honest one.

9. When property worth $35,000 is sold for $20,100 at a deed of trust sale, the inadequacy of price is not so great as to shock the conscience or raise a suspicion of unfairness.

No. 193. Submitted January 12, 1894.—Decided February 12, 1894.

HEARING on an appeal by the complainants from a decree of the Supreme Court of the District of Columbia, holding an equity term, sustaining a demurrer to and dismissing a bill to set aside a sale of real estate under a deed of trust. *Affirmed.*

The COURT in its opinion stated the case as follows:

This is an appeal from a decree dismissing the complainants' bill to set aside the sale of lot 13, in square 533, in the city of Washington, made by Wine and Rheem, trustees, to Leon Tobriner, December 29, 1892. The complainants are Mrs. Mary Anderson, her trustee, Lorenzo A. Bailey, and certain claimants of mechanics' liens on the property. The defendants are White, Brush and McCall, trustees and payees of the notes to pay which the sale was made; Wine and Rheem, trustees in the deed of trust, and Leon Tobriner, the purchaser.

The substantial averments of the bill are these: On June 14, 1892, Millard Metzger, then the owner of the property, conveyed the same to Wine and Rheem, trustees, to secure two notes, payable to the order of White, Brush and McCall, trustees, one of which for $3,185, was made payable November 1, 1892, and the second for $15,000 five years after date. The trustees, upon default in the payment of either note as it matured, or any instalment of interest, or any taxes, charges, &c., accruing against said property, were required to sell the same at public auction, after advertising it in one or more newspapers for at least ten days before the sale.

July 2, 1892, Mrs. Anderson purchased the property and received a conveyance subject to the aforesaid trust deed

and notes, which she assumed. There had been a fire in the house, and it was in bad condition when she purchased, and she repaired it and made an addition thereto, costing $8,000, "more or less." There were notices of mechanics' liens for nearly $4,000 against the property for the aforesaid improvements, and the holders thereof joined her as complainants. For about two months before the maturity of the said first note, the said Mrs. Anderson had been ill and unable to attend to her business affairs. Being convalescent, on October 29, 1892, she, having applied to others for a loan to pay said debts, notified the holders of the lien notes and requested indulgence for a reasonable period, to enable her to perfect said loan, which they harshly refused, and in turn notified her that in case of default, foreclosure proceedings would be begun. This request was again made, and refused by telegram, November 3, and again on November 4, on which day the note for $3,185 was duly protested for non-payment.

By reason of the harsh conduct of the holders in refusing delay and in protesting the note, her credit was injured. It is stated that she could have borrowed the money to pay off the notes had she been allowed a definite and reasonable time, because persons having money to lend insisted upon several weeks for investigation of title and other usual preliminaries. Furthermore, complainant Mrs. Anderson "was unable to obtain possession of a large sum of money, to wit, $4,000 more or less, which was due and payable to her shortly prior to November 1, 1892, and upon which she had relied to meet said note at that time."

During November and December, 1892, there was great difficulty in procuring loans, owing to a shrinkage in the value of money, &c. Furthermore, during December, 1892, the real estate market was dull for want of purchasers and for the reason that Christmas was at hand, "when secular matters receive less attention than at any other time of year."

These facts were known to the trustees, as well as the further fact that real estate dealers "expected that soon after

January 1, 1893, purchasers thereof would again reappear and restore activity and prices."

Complainant urged the delay of the sale, but disregarding her interest, the trustees, on November 26, 1892, advertised the property for sale on December 15. She protested again and again, but they declared their intention to sell because under positive instructions from the holders of the notes. On December 15 the day was cloudy, and a " rain storm was indicated by the usual signs of nature," and she again urged against the sale, but was again denied by the trustees, who said they would sell unless rain should actually fall. The sale proceeded, and the property was bid off at $22,000 by Joseph Young. Owing to the weather very few persons attended the sale, and complainant believes that no *bona fide* bidders attended. The said Young failing to comply with his bid, the trustees (under the express terms of the trust) readvertised the property, December 16, 1892, for sale on December 29.

Mrs. Anderson, having been defeated in her negotiations for a loan by the said conduct of the trustees and noteholders, commenced negotiations for a loan of $21,000 with the Anglo-American Savings and Loan Association, and had been notified that the money would be paid her in time to satisfy the notes before 4 P. M., December 29, 1892, on condition that her title should be found good and free from all other incumbrance. In order to facilitate this loan, Mrs. Anderson conveyed the property to Lorenzo A. Bailey, who is also a complainant, in trust, with power to execute the necessary trusts for the loan. She was frustrated in her effort to obtain the loan, and was notified December 28, 1892, by the association that the proposition was declined. This reconsideration was due, according to her information and belief, to statements made by said trustees, substantially as follows:

On the day of the first sale, referring to the action of Young in bidding and defaulting, Wine said to J. S. Wilmarth, who had acted for Mrs. Anderson in attempting to

procure the postponement: "This is a trick. Do you know whether or not Mrs. Anderson caused this to be done?" These words were spoken in such manner as to insinuate that Mrs. Anderson had by trick prevented the consummation of the sale.

Complainants believe that thereafter said Wine falsely repeated said statement, and others reflecting on Mrs. Anderson, to divers persons unknown.

Complainants are also "informed and believe" that defendant Rheem, about December 27, stated to F. L. Siddons, who was the attorney of the loan association aforesaid and to others unknown, that mechanics' liens for $4,000 had been placed on the said property and could not be removed save by cash payment. Said Wine and Rheem, about December 27, and at other times and places, told said Siddons, that prior to the first sale Mrs. Anderson, through some person or agent, had requested them for six days' time, in which she said she could pay the notes; and the said Young had asked for six days to make the cash deposit of $500 required to secure his bid, thereby insinuating that Mrs. Anderson had by falsehood and trickery endeavored to prevent said sale. Said insinuations were false, and made with intent to injure Mrs. Anderson and break off her negotiations for a loan. The said trustees, in a letter to J. B. Webb (who had, as her agent, written to them a letter to which this was a reply), stated that Mrs. Anderson had obtained indulgences in consideration of promises which she failed to perform. It is alleged that these were false and made with intent to injure her credit, and that said trustees " did in divers ways misconduct themselves and did in nowise endeavor to protect the interests of Mrs. Anderson," and forced the sale in order to obtain their commissions. On December 29, 1892, the sale was made to Leon Tobriner for $20,100.

It is then charged that this sale was unfair, because only two bidders were present; the weather, by reason of excessive cold, prevented the attendance of bidders; the time was

Christmas week, and a holiday season when most business, and particularly the buying and selling of real estate, is temporarily suspended; while crying the sale the auctioneer stated the recent improvements were worth $3,000 when he should have said $8,000; the published advertisement did not set forth the true value of the property; the trustees did not in said advertisement and otherwise invite and endeavor to obtain a fair sale and adequate price; the price obtained at the sale was grossly inadequate, as the property had been appraised at from $30,000 to $35,000 by three persons in November and December, 1892.

The correspondence respecting the extension of time, as also the notice of sale, are made exhibits to the bill. The first letter of the holders of the notes is a firm but polite refusal to extend the payment; and in the later letters and telegrams this is adhered to.

The defendants demurred to the bill, and from a decree sustaining the demurrer and dismissing the bill complainants have appealed.

*Mr. Lorenzo A. Bailey* for the appellants:

1. The power to postpone a sale at the discretion of the trustees is a power conferred by law irrespective of the terms of the deed of trust. In this case they should not have offered the property for sale when they found the weather so unfavorable. There was still greater reason to postpone the sale after the bidding ceased at $20,100, which was only 57 per cent. of the value. They had the power and it was their duty to postpone the sale then, and prevent the auctioneer from striking the property off to Mr. Tobriner. Their failure to do so was a fraud upon Mrs. Anderson. Perry on Trusts, Sec. 602 *z.*

2. There was further cause for a postponement of the sale. Mrs. Anderson had protested against a sale being made prior to the 1st of January for several reasons, which were known to the trustees. One of these reasons was that she was negotiating, with fair prospects of success, for money

to pay the matured note, and, but for the improper inter-
ference of the trustees, would probably have obtained the
money.  Another was that the day of sale, December
29, was " during Christmas week, and in a holiday season,
when most business, and particularly the buying and selling
of real estate, is temporarily suspended." See Perry on
Trusts, Sec. 602 x.

Mrs. Anderson's request that sale be delayed until Janu-
ary 1 was reasonable.  This request was made before ad-
vertisement or other steps toward a sale.  She was in default
for only one-sixth part of the whole indebtedness, and the
security for the debt was increasing in value.  Her good
faith was shown by her investment of large sums of money
in permanent improvements whereby she had increased the
value of the property from $25,000 to $35,000.  In the face
of all this, the trustees, within four weeks after default, ad-
vertised the property for sale and selected as the day of sale
the 15th day of December, but declaring the purchaser in
default they postponed the sale until December 29, refusing
Mrs. Anderson even the three days she asked for to avoid a
sale during Christmas week.

Their conduct throughout shows that they were deter-
mined to sell before the 1st of January.  They acted with
indecent haste to advertise the property.  They were urged
to this by the holders of the note, but it was their duty to
resist undue pressure from that quarter.  The main purpose
of a trustee's appointment is to secure impartial men to
stand between unfortunate debtors and heartless creditors.
Mrs. Anderson was, in all fairness, entitled to extraordinary
indulgence.  When the note matured she was just recover-
ing from a severe illness which had prevented her from at-
tending to any business for two months, and had sustained
a severe financial loss.  The disposition of the note-holders
toward her as shown in their letter of October 31, threaten-
ing her, before the note became due, with an immediate sale,
is suggestive of Shylock, and clearly indicates that they
knew the trustees to be under their control.  This case

presents fairly and squarely the question: Is a trustee in such cases subject to the orders of the creditor, or is he invested with discretion so that he shall act impartially to protect and promote the interests of the debtor as well as those of the creditor? The success of the appellees here would make this an isolated case in the history of equity jurisprudence. Perry on Trusts, Sec. 602 *o*; *Hunt* v. *Bass*, 2 Dev. Eq., 296; *Johnston* v. *Eason*, 3 Ired. Eq., 334; *Black* v. *Smith*, MacA. & M., 338; *Goodwin* v. *Mix*, 38 Ill., 115; *Barnard* v. *Duncan*, 38 Mo., 170; *Dance* v. *Goldingham*, L. R. 8 Ch. App., 902.

3. Concerning the value of the property at the time of the sale, it is alleged that Duncanson, the auctioneer, had appraised it at $35,000; that Mr. Weller, who appraised it at $30,000, offered $22,000 on December 15, and that an offer of $3,000 per annum as rental was pending. The debt secured was over $18,000, and property worth double, or nearly double, the amount of the debt is usually required for security. "The trustee should inform himself of the value of the property, if necessary, by the estimate of some experienced person; and if he sells at a grossly inadequate price, it is a breach of trust which affects the title in the hands of the purchaser." Perry on Trusts, Sec. 770; see also Secs. 771, 602 *ee*.

4. At the hearing in the court below the main argument of the defendants appeared to be to the effect that the plaintiffs should have applied for injunction before the sale, and their failure to do so was laches which should be held to prevent any disturbance of the rights of Tobriner, an alleged innocent purchaser for value. Such argument hardly deserves serious notice. This bill was filed before any conveyance was made to Tobriner, and it is well settled that even a *bona fide* purchaser, without notice, to be entitled to protection, must be so, not only at the time of the contract or conveyance, but until the purchase money is actually paid. *Wormley* v. *Wormley*, 8 Wheat., 421. But Tobriner was not an innocent purchaser without notice. The deed of

trust had been duly recorded, and notice was thereby given to him of the trusts. He had also notice of the state of the weather, scarcity of bidders, inadequacy of price and other circumstances tending to show unfairness of the sale. But apart from all this he could not take more than the trustees could give him, and they could give him nothing in violation of their trust. They must be judged by their acts, and as it appears that they were swayed by private interests or selfish motives, *Wormley* v. *Wormley, supra* per Story, J., or even if they depart innocently from the course prescribed in the deed of trust, *Id. per* Johnson, J., the purchaser is affected thereby, and the sale will be set aside.

5. The case of *Fowler* v. *Taylor*, 19 D. C., 456, is alone sufficient to sustain this bill. In that case the unsuitableness of the hour of sale was held to be a circumstance calculated to cast suspicion on the correctness of the sale, and the great inadequacy of the price a strong and sufficient auxiliary argument to set aside and rescind the sale. In that case the price was about 75 per cent. of the value. In this case the price was only fifty-seven per cent. of the value, and the trustees were guilty of deliberate misconduct, in fixing upon a day and selling in Christmas week during excessively cold weather, and otherwise.

*Mr. A. S. Worthington* for the appellees.

Mr. Justice SHEPARD delivered the opinion of the Court:

Courts of equity are charged with no power of relief against the hardships and misfortunes which sometimes attend upon the prompt and rigid enforcement of debts and obligations which have matured in accordance with contracts whose validity is conceded. Deeds of trust to secure debts, with powers of sale upon short notice, which have been deliberately and fairly made, may, by being pushed to speedy sale immediately upon default, in times of unexpected depression, or even in ordinary times, cause property to sell for less than could reasonably have been expected at their dates, and be otherwise attended with results

disastrous to the plans and hopes of their makers. Notwithstanding, they, have grown into almost universal use under the permission and encouragement of the law, as a ready means of effecting loans; and while in some jurisdictions they have been limited in their scope and operation, they have rarely, if ever, been abolished, because, doubtless, their general conveniences and advantages have been considered as more than counterbalancing the exceptional hardships which may result from their swift and sometimes merciless enforcement against an unfortunate debtor; these hardships being no greater, however, than those which have often attended a rigid or heartless enforcement of liens and debts by the ordinary legal process. As long as these contracts are entered into by permission of law, they must be respected and not interfered with, unless upon some well recognized principle of equity applicable alike to all contracts of the same general nature.

Wherever the terms of the trust have been followed, and no violation of duty on the part of the trustees can be shown, the hardship of the condition of the mortgagor will not excuse the interposition of courts of equity.

That "times are hard," or "money scarce," or the "time of year" unpropitious, or that the property would likely sell for a great deal more at a later period, afford no ground for equitable relief. Interference for such causes would be to impair the obligation of contracts and to extend the guardianship of the courts to those laboring under no disability to contract for themselves. Moreover, by interference upon slight foundation to prevent hardship to the debtor, one equally as great might be brought upon the creditor, who might also be the debtor of a third person, and thereby suffer even a greater disaster by failure to collect the money due him.

This case itself presents an example of this; for complainants say in their bill that Mrs. Anderson "was unable to obtain possession of a large sum of money, to wit, $4,000 more or less, which was due and payable to her shortly prior

to November 1, 1892, and upon which she had relied to meet this note," for $3,185, maturing November 1. If she had been able to collect this money promptly it would more than have discharged her first note then maturing, and it would not have gone to protest, and no sale would have occurred. It may possibly be that the holders of these notes sustained some special injury or incurred some additional liability by her default. There are sometimes two sides to these equities, just as there are two parties to the contract sought to be enforced.

With respect, too, to the facts of this case, it may be said that courts of equity will more readily interfere with sales under trust deeds before they are made and purchasers thereunder have acquired equitable rights, than when parties, with knowledge of all the circumstances which ought to render the sale invalid, take the chances thereof, and only apply to the courts after it has taken place with results undesired and to some extent unexpected. Parties who with knowledge of sufficient facts in time before sale to apply to the courts to prevent it, will not, as contended by appellees, be estopped to impeach the sale after it is made (unless, indeed, they may have stood by and permitted an innocent purchaser to pay out his money in the belief of its validity); but they will be required to allege and prove substantial violations of the trust or other plain misconduct of the trustees. Where there has been misconduct on the part of the trustees affecting the fairness of the sale, or where they have violated the terms of the trust in any material particular, or where the sale has been upon such inadequate consideration as to shock the conscience and of itself suggest fraud or misconduct, equity will interpose and set aside the sale upon the application of the mortgagor and sometimes of the mortgagee.

It must be borne in mind that we are here discussing sales made under the ordinary trusts to secure loans, and enforceable upon stipulated terms and notices at the demand of the creditor or holder of the secured debt. Another

and different rule applies to cases of sales under trusts of a different character, such as trusts to sell for partition or distribution and the like, and it is this rule which the authorities cited on behalf of appellant, in the main, support, without trenching upon the operation of the other. The discretion imposed in the trustees in the one case is widely different from that in the other. In the one they are charged with the duty to so arrange for the sale without unnecessary delay as to secure the highest possible price for the property; this being the object of the trust and the interests of the beneficiaries being identical. But this discretion is entirely wanting in the other. Their duty is to sell after default, upon the demand of the security holder in the manner and upon the notice prescribed in the trust. They cannot sell upon holidays, or at unusual or unreasonable hours; but they have no right, on the other hand, to refuse to sell until some time in the future that may be more satisfactory or advantageous to the mortgagor. Appeals for delay to a more favorable or convenient season must be made to the creditor. The terms of the instrument measure the powers and prescribe the duties of the trustees. It remains to consider the principles which have been discussed in application to the facts alleged in the bill.

There was no misconduct on the part of the trustees. The note was protested November 4, 1892. The first sale was advertised to take place December 15. When Young failed to make good his bid, they readvertised in the required manner for sale on December 29. They did not mislead the complainant in any particular. The only definite or well pleaded charges of misconduct are that one of them denounced the bid of Young as a trick, and asked Mrs. Anderson's representative if he knew whether she caused it to be done. As she was the only person directly interested in the delay of the sale the suspicion was not so unnatural as to show malice; and we do not see how its expression under the circumstances could affect the subsequent sale. Again, the trustees are charged with telling the

attorney of the loan company of the existence of the mechanics' liens of about $4,000, with the intent to prevent Mrs. Anderson from perfecting a loan which it had under consideration. As the statement was true, according to the allegations of her own bill, and one which she would have been bound in honor to have communicated herself, we cannot perceive how it could affect the case or afford a certain inference of malice on the part of the trustees, or a desire to destroy her credit. If the knowledge of these liens, as is probable, did prevent the loan being made, how can the fault be charged to the trustees?

The charge that two bidders only were present does not mean that only two persons were present; its meaning can only be that only two persons actually made bids at the sale. This is doubtless very often the case at similar sales. That "the excessive cold prevented the attendance of bidders" is not sufficient, because it appears from the allegations that there were "bidders," and no specific fact is alleged from which the court could determine whether or not possible bidders were reasonably prevented from attending the sale. In some sections of the country, if this be a sufficient allegation, a valid sale could hardly be expected to be made in the winter; while in others excessive heat might be alleged as a preventive of attendance at other seasons.

Surely there is no precedent for saying that a sale cannot properly be made during Christmas week. That the auctioneer stated the value of improvements on the lot made since Mrs. Anderson's purchase to be $3,000 instead of $8,000, is a matter of no consequence. It is not made to appear that this was not an honest mistake on his part. It does not appear that any one of complainants' representatives corrected, or attempted to correct, this statement, as might easily have been done at the time. It is not probable either that prospective purchasers of property of such value were, or could have been, influenced by statements of the auctioneer.

There is no great inadequacy of price in the sale—certainly not such as to shock the conscience or raise a sus-

picion of unfairness. Complainant alleges the value in general terms to have been $35,000, and states that it had been appraised in November and December by three persons, two of whom estimated it at $35,000, and the third at $30,000.

From what has been said, the conclusion follows that the facts alleged in the bill are not sufficient to authorize the setting aside of the sale, and the court did not err in sustaining the demurrer.

*The decree appealed from must be affirmed, with costs to the appellees; and it is so ordered.*