### SNOW v. SNOW.

(Court of Appeals of District of Columbia.  Submitted October 14, 1920.  Decided January 3, 1921.)

No. 3383.

1. **Action ⊚⟳6—Execution of quitclaim deed held not to have made case moot.**

   Where plaintiff sued his wife for specific performance of her antenuptial agreement to waive all claim to plaintiff's property and to execute such conveyances as he might request, and alleged her refusal to execute a deed to an intervener, as a result of which refusal his negotiations for the sale of other real estate were discontinued, the execution by the wife of a quitclaim deed to the intervener did not render the case moot, so as to defeat the husband's right to have the validity of the antenuptial agreement determined.

2. **Trial ⊚⟳25 (4)—Plaintiff, who has burden of proving fairness of agreement, has right to open and close.**

   In a suit by the husband for the specific performance of his wife's antenuptial agreement, where the defense was fraud, and the defendant claimed the burden was on plaintiff to prove the perfect fairness of the agreement, plaintiff had the right to open and close.

3. **Appeal and error ⊚⟳969—Ruling as to right to open and close not reviewable.**

   The ruling of a trial court on the question as to who should open and close a case is merely upon a matter of practice, not proper to be made the subject of exception or to be reviewed on appeal.

4. **Appeal and error ⊚⟳1009 (3)—Court's finding on conflicting testimony reviewable only if manifestly wrong.**

   In a suit for specific performance, the findings by the trial court, based upon conflicting evidence, all of which was given orally in his presence, will not be disturbed on appeal, unless they are clearly wrong.

5. **Husband and wife ⊚⟳34—Evidence held to show antenuptial agreement was supported by consideration.**

   In a suit by husband for specific performance of his wife's antenuptial agreement to waive her claim to a share of his estate, evidence *held* sufficient to sustain the trial court's findings that the agreement was based on a valuable consideration and fairly arrived at, so as to be valid.

   Robb, Associate Justice, dissenting.

Appeal from the Supreme Court of the District of Columbia.

Suit by Chester A. Snow against Addis H. Snow for specific performance of an antenuptial agreement.  Decree for plaintiff, and defendant appeals.  Affirmed.

Henry E. Davis, of Washington, D. C., for appellant.

J. J. Darlington, George P. Hoover, and F. J. Hogan, all of Washington, D. C., for appellee.

SMYTH, Chief Justice.  The parties to this suit are husband and wife living apart under a decree of divorce a mensa et thoro.  The appellee, as plaintiff, brought suit against the appellant for specific performance of an antenuptial agreement.  A decree was entered in favor of the appellee, and the appellant, alleging error, brings the decree here, asking for its reversal.

Appellee married the appellant July 29, 1913.  At that time he was

---

⊚⟳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

about 70 years of age and she 36. He was a man of much wealth and had an annual income in the neighborhood of $60,000. About two days before their marriage he exhibited to her a draft of a proposed agreement waiving her right to dower in his property, and reciting the payment to her of $30,000 "as an antenuptial marriage settlement," and asked her if she was willing to sign it, to which she replied that she was. He did not then ask her to sign, but, in response to his request, she went to his office the next day, and there he again submitted the draft to her, with the request that she read it. She read it in part, and, perceiving it was practically the same as the one he had exhibited to her the day before, she, at his request, signed it in the presence of two witnesses. She now avers that it was procured by fraud and should be treated as of no effect.

By it she was obligated to sign promptly all papers which the appellee should present to her for the purpose of relinquishing her interest in his estate.

Having sold some real estate, appellee submitted to her a deed of conveyance for her signature. She refused to sign, except upon a condition to which he was not willing to consent. Thereupon he brought this suit. While it was pending the purchaser of the real estate intervened and asked that appellant be required to execute a quitclaim deed releasing to it, a corporation, her inchoate right of dower in the property, without prejudice to any claims she might have against the appellee. In answer to a rule upon her, she, through her counsel, in open court, expressed her willingness to execute the conveyance. Thereupon the court, over the objection of the appellee, entered an order directing her to do so; subsequently she complied with the order.

[1] It is asserted that by the execution of the quitclaim deed, just referred to, the prayer of the bill was satisfied, and that, as there was nothing more for the court to consider, the suit should have been dismissed. This is a misapprehension. The bill prayed, not only for relief with respect to that particular piece of real estate, but also with respect to all other lands which her husband owned or might subsequently acquire. This prayer for relief is supported by uncontradicted testimony that before filing the bill appellee had entered into negotiations with certain real estate agents looking towards the sale of other real estate owned by him, but that he was compelled to abandon them because his wife refused to join in the conveyances. This, we think, entitled him to proceed with the case for the purpose of having determined once for all whether or not it was her duty to sign deeds of conveyance of his real estate when they were presented to her for that purpose.

[2, 3] Counsel urges that appellant had the right to open and close the case, but he cites an authority (13 R. C. L. 1011) to the effect that the burden was on the appellee to prove the perfect fairness of the agreement. If this be correct, then the court did not err in giving to the appellee the right to open and close. However that may be, it is the law:

"That the ruling of a trial court on the question as to who should open and close a case is merely upon a matter of practice not proper to be made the

subject of exception or to be reviewed upon writ of error." Overby v. Gordon, 13 App. D. C. 392, 406.

To the same effect, see Lancaster v. Collins, 115 U. S. 222, 225, 6 Sup. Ct. 33, 29 L. Ed. 373, and Hall v. Weare, 92 U. S. 728, 732, 23 L. Ed. 500.

We now come to the issues of fact with respect to the validity of the agreement. The court below found that the parties, before they definitely became engaged to marry, had in mind an arrangement by which the appellant was to give up her marital rights in the appellee's property, that the appellant knew the nature of those rights, that she deliberately entered into the antenuptial agreement with a complete understanding of its terms, and that she knew that if the appellee should die as wealthy as he then was, leaving her his widow, her interest in his estate would be worth much more than the amount she received under the agreement. Have these findings any support in the testimony?

Appellee asserts that several times during the three or four months before their marriage the matter of an antenuptial agreement was discussed by them. She denies this, and says nothing was said about it until the draft of the agreement was submitted to her the day before their nuptials. He testified that he paid the $30,000 recited in the agreement by delivering to her his promissory note for $30,000 on the day the agreement was signed, though it was drawn, he says, some days before. She takes issue with him, and says the note was delivered the previous day, and had no connection whatever with the agreement, but was given in lieu of an annuity which she had been receiving from a benefactor, and which she was about to surrender. In response to a question her counsel admitted in open court that it was "absolutely so" that she understood that by signing the agreement and receiving the $30,000, she would waive her rights in the estate of her prospective husband. She concedes that she was aware, before she signed the agreement, that he was a man of abundant wealth, and admits knowledge at that time that a wife had some rights in her husband's property and that she had heard of a "widow's third." He says she thoroughly understood her rights, for they had discussed them often before the agreement was signed, and there is testimony showing that the agreement was prepared at her request, so that he might understand that she was not marrying him for his property, but because of the esteem in which she held him.

[4] Without pursuing the subject further, let it be sufficient to say that on every point which she did not admit there was a conflict in the testimony, all of which was delivered in the presence of the court. He had an opportunity to study the witnesses as they testified, an advantage which we do not possess. In the light of that study, and of all the circumstances under which the testimony was given, he reached the conclusions just stated. It has been frequently adjudged by this court, and by the Supreme Court of the United States as well, that conclusions arrived at in that manner will not be disturbed by the reviewing court, unless they are clearly wrong. In Nash v. Milford, 33 App. D. C. 142, 144, 149, Mr. Justice Robb, speaking for the court in a

suit for specific performance, said of the findings of an auditor, confirmed by the court:

"Such findings will not be set aside, unless it appears that there has been an error in law or a conclusion of fact unwarranted by the evidence."

In another case Mr. Justice Van Orsdel used this language:

"The appeal presents no question of fact of sufficient importance as a precedent to justify an extended review of the evidence. It was tried in open court, with full opportunity in the trial justice to observe the demeanor of witnesses and to judge of their veracity. In such cases the finding of the trial justice on questions of fact has much the same sanctity as the verdict of a jury, and will not be disturbed on appeal unless a mistake of judgment is so apparent as to demand a reversal." McLarren v. McLarren, 45 App. D. C. 237, 238.

In Lawson v. United States Mining Co., 207 U. S. 1, 12, 28 Sup. Ct. 15, 19 (52 L. Ed. 65), this was said:

"With reference to the conclusion of the Court of Appeals it is sufficient to say that, if the testimony does not show that it is correct, it fails to show that it is wrong, and under those circumstances we are not justified in disturbing that conclusion. It is our duty to accept a finding of fact, unless clearly and manifestly wrong."

It is the settled rule of procedure that where—

"the finding of the master or judge who saw the witnesses 'depends upon conflicting testimony, or upon the credibility of witnesses, or so far as there is any testimony consistent with the finding, it must be treated as unassailable.'" Adamson v. Gilliland, 242 U. S. 350, 353, 37 Sup. Ct. 169, 170 (61 L. Ed. 356).

Bearing upon the same point are United States Trust Co. v. Blundon, 42 App. D. C. 500, 508, and Butte & Superior Copper Co., Ltd. v. Clark-Montana Realty Co. et al., 249 U. S. 12, 30, 39 Sup. Ct. 231, 63 L. Ed. 447.

[5] A careful examination of the record satisfies us it cannot be correctly said that any of the court's findings is "clearly and manifestly wrong." On the contrary, it appears that they are amply sustained by the testimony. They show that the agreement rests on a good consideration, $30,000, and was fairly arrived at. This being so, it merits the law's sanction. Birbeck's Estate, 215 Pa. 323, 64 Atl. 536; Smith's Appeal, 15 Pa. 319, 8 Atl. 582; In re Devoe's Estate, 113 Iowa, 4, 84 N. W. 923; Biblehausen v. Biblehausen, 159 Wis. 365, 150 N. W. 516; Hockenberry v. Donovan, 170 Mich. 370, 136 N. W. 389.

For the reasons given, we are constrained to hold that the decree should be, and it is, affirmed, with costs.

Affirmed.

ROBB, Associate Justice (dissenting). For two years prior to the marriage of Mrs. Snow, a friend, a lady of large means, had provided her with an annual income of $1,500, derived from a principal of the estimated value of $30,000. The evidence is clear and convincing that it was the intent of this friend to make this benefaction permanent. This appears from the uncontradicted testimony of the lady and her husband. Mrs. Snow became engaged to Snow on July

22, 1913. Shortly thereafter, and before their marriage, she suggested the propriety of surrendering this benefaction, which suggestion Snow approved. Mrs. Snow testified, and other facts and circumstances tended strongly to corroborate her, that Snow thereupon said he would make good the amount, and that he immediately signed and delivered to her a promissory note for the $30,000. Subsequently, when Snow delivered to her securities in that amount, the note was surrendered to him. Its production would go far toward settling the vital issue in this case. Among all the papers bearing upon the case and coming into his hands, it is significant that this is the only one not produced. That Snow fully understood how this sum of $30,000 was arrived at is evident from the letter accompanying the securities, and in which he said:

"You do not like this talk of money, but my conscience must have this anodyne—that, no matter what our future may be, you will be independent, and not worse off than I found you."

I am fully convinced that the only consideration for the so-called antenuptial agreement subsequently signed by Mrs. Snow was this $30,000, and that her signature to that agreement was obtained through subterfuge. Snow himself admits that at the time the agreement was signed he was possessed of more than $1,000,000, with an annual income of almost $70,000. It may be conceded that Mrs. Snow understood that he was a man of means, but wealth is a relative term. She undoubtedly would have considered $200,000 a very large sum, and Snow did not inform her as to the extent of his wealth.

It results, therefore, that this wife, a lady of character and refinement, has surrendered, without any actual consideration, her interest in an estate of more than $1,000,000. In my view, the explanation of the conduct of this man lies in the fact that his love of money has dwarfed and withered every other impulse.

I dissent.