**POLLOCK v. JAMESON et al.**

**No. 6090.**

Court of Appeals of the District of Columbia.

Argued March 8, 9, 1934.

Decided April 9, 1934.

P. H. Marshall, of Washington, D. C., for appellant.

W. Gwynn Gardiner, Geo. E. Sullivan, G. Percy McGlue, Thomas F. Burke, Paul Murphy, and Francis C. Stetson, all of Washington, D. C., for appellees.

Before MARTIN, Chief Justice, and ROBB, VAN ORSDEL, HITZ, and GRONER, Associate Justices.

GRONER, Associate Justice.

Appellant was formerly the widow of Thomas A. Jameson, who died March 29, 1932. Her marriage to Jameson occurred December 7, 1930. She remarried some fifteen months after Jameson's death. Appellees are the heirs at law and next of kin of Jameson. The suit was brought by them to obtain specific performance of an antenuptial contract dated December 3, 1930, made by appellant with her husband Jameson, and also to have decreed the specific performance of a subsequent settlement-agreement made by Jameson's heirs with appellant after Jameson's death. The evidence discloses that Jameson, who was then unmarried, had continuously for 20 years boarded with appellant in the residence known as 11 W Street Northwest, Washington City. The house was owned by Jameson, and was occupied by appellant and her then husband, who was a watchman in one of the government departments. Appellant's first husband died in 1927, and Jameson continued thereafter to live in the house as before.

Somewhere around the 1st of December, 1930, Jameson and appellant, in anticipation of marriage, went to the office of an attorney named Quigley, who, at Jameson's request, drew up the antenuptial contract. The contract was subsequently executed in Quigley's office by appellant and Jameson, either on December 3 or on December 5. There is some dispute whether it was signed the day on which they left for Atlantic City to be married or two days before, but this is not material. Appellant testified that, after she had signed the contract, Quigley asked her if she had read it, and she said she had not, and Quigley then asked her to read it, and she in turn asked that it be read to her, and this was done, and she likewise testified that until it was read to her she did not know she had signed away her dower rights.

By the terms of the agreement Jameson agreed to pay appellant after their marriage the sum of $8,000 in money and to convey to her and to himself, as joint tenants, the W Street residence and also, as joint tenants, a 500-acre farm near Bryantown, Md., together with the growing crops and furniture and fixtures, etc., on the farm, in consideration of which appellant agreed to relinquish all rights of dower and all claims of any kind in Jameson's real or personal estate.

Within a few days after the marriage, Jameson conveyed the W Street property and the farm as provided in the contract, and paid over to appellant at different dates within the following two and a half months a total of $14,342.09. The residence property was valued at $10,000 and the farm at $25,000, and shortly after the conveyance of the farm to appellant and her husband as tenants by the entirety, they in turn conveyed the farm to Jameson's brother, George Jameson, and Jameson, at or about the same time, transferred to appellant as beneficiary certain of his life insurance policies amounting to $32,500, which, together with another policy of $2,500 transferred to her some time before the marriage, made a total of $35,000 in life insurance, all of which she collected. After the death of Jameson, appellant claimed that the deed to the farm executed by herself and Jameson did not include the crops and personal property, and that issue was settled by the payment by George Jameson to appellant of $8,871.50. She at the same time consulted Quigley professionally with a view to having him represent her in an effort to get as much for her as possible out of the estate without the necessity of a proceeding in court. At Quigley's suggestion, appellant and George Jameson were appointed administrators of Jameson's estate, he having died intestate. The value of Jameson's property at the time of his death was stipulated at $500,000, and some two weeks after the granting of letters of administration, an agreement was entered into between appellant and Jameson's heirs as the result of which she was paid the sum of $35,000 in cash and in consideration of which she filed a paper in the following

words: "I, Margaret A. Jameson, hereby acknowledge receipt of the sum of $35,000 in full settlement in regard to contract dated December 3rd, 1930, in regard to the estate of Thomas A. Jameson, deceased and any or all interest I had or may have in the said estate to any distributive share or right of dower and I hereby agree to execute petition for my resignation as coadministrator of the estate of Thomas A. Jameson and a formal receipt to be deposited with the court and also a contract with the heirs or representative of the heirs of the said estate in regard to the payment of the sum hereinbefore mentioned."

Her resignation as coadministrator was duly executed and delivered to Quigley. A little while after these events appellant became dissatisfied and consulted another lawyer, and on his advice notified Quigley, to whom her resignation as administratrix had been delivered, that she desired to recall the same and to return the $35,000 she had received, and directed him not to file her resignation as administratrix in court. Quigley replied to this that he had already delivered the resignation to counsel for the estate and that the heirs would not cancel the agreement or accept the tender of the $35,000. The resignation having been filed in the office of the register of wills, appellant filed therein a request to the court that her resignation be disregarded. Subsequently a bill of complaint was filed by appellees, in which they asked that appellant be required to specifically perform and carry out her agreements, and that the court hold that she be treated as having no share or interest of any kind in the estate. Appellant filed an answer in which she denied that the antenuptial agreement was binding and in which she likewise denied the binding effect of the subsequent agreement, and asked that the showcause rule issued against her should be dismissed.

The evidence was taken in open court, and at its conclusion the trial judge made certain findings of fact and conclusions of law, which appear in the record. In condensed form the findings of fact are as follows:

First. That the antenuptial agreement was executed, acknowledged, and delivered in duplicate on December 3, 1930.

Second. That appellant and Jameson were married in Atlantic City December 7.

Third. That after the marriage appellant obtained from Jameson while he was still alive all the items of consideration provided for in the antenuptial agreement and in the manner provided for therein.

Fourth. That Jameson died intestate on March 29, 1932, without having revoked or authorized the revocation of the antenuptial agreement.

Fifth. That following the death of Jameson, appellant employed Quigley as her attorney to negotiate with the adult heirs of her late husband for the purpose of obtaining an additional sum of money; that in consequence of these negotiations she received through her attorney $35,000.

Sixth. "No facts are established by the evidence showing any fraud, imposition, or unfairness, of any kind, practiced upon the defendant [appellant] either in connection with the antenuptial agreement or the settlement which took place after the death of said decedent."

Seventh. "The defendant [appellant] knew and understood all that she was doing with respect to the antenuptial agreement and also with respect to the settlement."

The court on June 23, 1923, entered a final decree which declared that appellant was without any right, title, or interest by way of dower or otherwise in or to the estate of Jameson and directed appellant to execute and file in the probate division of the court a final, unqualified and absolute resignation of her coadministratorship. From this decree this appeal was taken. Some twenty-odd assignments of error were filed by appellant, seven of which relate to rulings of the court on the admission or rejection of evidence; the others to findings of fact by the court below on the evidence.

■ We have been at pains to examine the procedural errors complained of, but we are not impressed with their materiality. If it be conceded that as to some of them error was committed, it was harmless error. The matters complained of were trivial so far as the true issue involved is concerned. The refusal of the court to permit the witness Quigley to answer that he drew the antenuptial agreement at Jameson's request was clearly error, but it was cured by other evidence which unmistakably showed this fact, and the court below could not have been in any doubt that the contract was drawn at Jameson's instance. The entire evidence shows this.

■ Assignment 4 was not insisted on in the argument, nor is it mentioned in the brief, but assignments 2, 3, 6, and 7 charge that the court erred in admitting evidence of cer-

tain moneys paid to appellant by Jameson after the execution of the contract and after the marriage. When it is considered that appellant in her answer specifically defended on the ground that she had not received the consideration named in the contract, it is difficult to understand on what ground evidence that it had been paid and received should be rejected. We think the point wholly without merit.

■ The remaining assignments, grouped together, deny the validity of the findings of fact by the court. The trial judge saw the witnesses and heard them testify. Where the evidence was conflicting, he had the opportunity of observing their demeanor and their method of testifying and hence of weighing the truth of their respective statements. In every way he was in a better position than we are to determine where the truth lay. In such circumstances, while perhaps we are not bound by his findings of fact, as we would be upon a writ of error, the rule is nevertheless well settled that where the judge has seen and heard the witnesses, his findings will not be disturbed unless it clearly appears that he has misapprehended the evidence or that he has gone against the clear weight of the evidence, or, as it is sometimes said, unless the evidence certified shows that his findings are clearly wrong. United States v. United Shoe Mach. Co., 247 U. S. 32, 41, 38 S. Ct. 473, 62 L. Ed. 968; Adamson v. Gilliland, 242 U. S. 350, 37 S. Ct. 169, 61 L. Ed. 356; D. T. McKeithan Lbr. Co. v. Fidelity Co. (C. C. A. 4th) 223 F. 773; Wolf Mineral P. Corp. v. Minerals S. Corp. (C. C. A. 4th) 18 F.(2d) 483, 486; Snow v. Snow, 50 App. D. C. 242, 270 F. 364; McLarren v. McLarren, 45 App. D. C. 237, 238.

■ We have, however, examined the evidence for ourselves. It shows that appellant has received altogether in excess of $103,000. It likewise shows that she is a woman of mature years who at the time of her marriage to Jameson had grown sons and had for a long time conducted a boarding house. We are convinced, notwithstanding her evidence to the contrary, that she understood the nature of the agreement which she entered into with her husband prior to the marriage. Whether she then knew the exact amount of his property is not, as we view the matter, material. They had lived under the same roof for twenty years, and she must have known in a general way the extent of his activities and likewise in a general way the nature of his business. It is not claimed by her that he deceived her as to the value of his property and thus induced her to accept in lieu of dower an inadequate present sum, nor is there any showing of an engagement by her to him prior to the making of the antenuptial contract. In these circumstances, we think there was no obligation on the part of the man she subsequently married, without inquiry or request from her, to make any disclosure of the extent of his wealth. After the marriage occurred, Jameson executed the two deeds in the manner provided in the contract, and the fact that she afterwards joined him in conveying the farm to his brother, without some showing of coercion or mistake or fraud, does not affect the validity of that transaction. And the further fact that she received at that time life insurance policies in the amount of $35,000, which she afterward collected in full, indicates, we think, beyond question that she voluntarily agreed to this substitution. She testified that after the marriage her husband delivered both copies of the marriage contract to her and told her to put them away, whereas other evidence shows that one copy of the marriage contract was kept in the safe in his office until his death and then disappeared. And the evidence shows that one of her sons had access to the safe. It is evident to us that the trial judge was satisfied of the untruthfulness of her statement in this respect, and we think we have not the right nor have we the means of weighing this contradictory evidence.

The trial judge had many opportunities not available to us to winnow the true from the false, and when we consider that it is admitted appellant had stated after her husband's death she had never received the $8,000 contracted to be paid to her in the marriage contract, when in fact she had received nearly twice as much, and that she testified that she had no recollection of ever having received the deed to the Maryland farm, when immediately after her husband's death, in a conference with his brother George, she disclosed clearly the fact that she knew all about that transaction, we cannot say there was not ample ground for the refusal of the court to accept her evidence as true where different testimony was given by other witnesses. Her statement that she had complained to her husband of the unfairness of the marriage contract on numerous occasions and that he had invariably told her to tear up the contract was also rejected by the lower court as untrue. If she had possession of both copies of the contract, as she claims, and if her husband in fact told her to tear

them up, nothing would have been simpler than to have produced them then and there and destroyed them, and yet she gives no explanation of her oft-repeated complaint and his equally oft-repeated authorization to destroy the contract and the fact that, though she had the means at hand of accomplishing her wish, she did nothing. Only an original and a copy of the contract were signed by her, and yet she repeatedly testified that she was all the time under the impression the contract had been recorded, while at the same time claiming to have possession of both the original and the copy. It is as difficult to reconcile these statements, as it is her other statement that the W Street property, which formed part of the consideration of the contract, was already hers by deed from Jameson executed long before the marriage and which deed she had lost. But whatever may be urged in her behalf in these respects is lacking in respect to her agreement made subsequent to her husband's death whereby she settled her claims against the estate for $35,000. It cannot be claimed as to this settlement that she was not then in possession of all the information obtainable as to her husband's wealth. She signed the application to be appointed administratrix of the estate and informed the notary who took her affidavit that she had read it and knew the contents. It was a short paper and contained an itemized schedule of property left by the decedent. She had stated prior to this time to one of her husband's brothers that her husband had informed her he was worth $1,000,000. She had the advice and assistance of her grown son, who appears to have been present at all the different interviews which occurred from her husband's death to the time of the signing of the agreement. She had also the advice of a lawyer, whom she subsequently repudiated but who, so far as we can see, was not guilty of any duplicitous conduct in his relations with her and who, whatever hopes he may have entertained that he would be employed to superintend the administration of the estate, had not then been employed to represent any of the heirs at law.

In these circumstances, we think we may appropriately repeat what we said in another case, which, like this, was a suit for specific performance of an antenuptial agreement. There, after discussing the conflicting evidence, we said: "Without pursuing the subject further, let it be sufficient to say that on every point which she did not admit there was a conflict in the testimony, all of which was delivered in the presence of the court. He had an opportunity to study the witnesses as they testified, an advantage which we do not possess. In the light of that study, and of all the circumstances under which the testimony was given, he reached the conclusions just stated." Snow v. Snow, supra, 50 App. D. C. 244, 270 F. 364, 366. Applying here the rule applied there, we find no proper ground for disturbing the findings of fact of the trial court, and in that view, it is our duty to affirm the decree.

Affirmed.