**HOTEL LAFAYETTE, Inc., et al. v. PICKFORD et al.**

No. 6476.

United States Court of Appeals for the District of Columbia.

Decided July 20, 1936.

Edward F. Colladay and Joseph C. McGarraghy, both of Washington, D. C., for appellants.

William C. Sullivan and Bates Warren, both of Washington, D. C., for appellees.

Before MARTIN, Chief Justice, and ROBB, VAN ORSDEL, GRONER and STEPHENS, Associate Justices.

STEPHENS, Associate Justice.

This is an appeal from a decree of the Supreme Court of the District of Columbia dismissing a bill of complaint filed by the appellants as plaintiffs below against the appellees as defendants below. The bill sought specific performance of an alleged contract for a lease of a hotel and for a sale of the furniture, fixtures and equipment—hereinafter referred to as furnishings. The bill sought also to set aside a foreclosure sale, made under certain deeds of trust, of the furnishings and of a lease of the hotel. The case was. heard on the merits.[1] Each of the two aspects of the case will be considered separately.

1. Concerning the alleged contract: It appears that prior to October 7, 1932, Smith was in possession of the Hotel Lafayette, located at 16th and I Streets, N. W., in the District of Columbia, and of the furnishings thereof—this by virtue of certain antecedent transactions whereby he had purchased leases of the hotel and bought the furnishings.[2] Pickford was the lessor and also the owner and holder of promissory notes evidencing an unpaid balance of the purchase price. On October 7, 1932, Smith was in default on both the rent and the notes, and on that date he and Pickford executed the following agreement:

"Mr. Walter Fletcher Smith,

"Hotel Lafayette, Washington, D. C.

"Dear Sir:

"If you will turn over the Hotel Lafayette and the furnishings to me, I will furnish the money necessary to make repairs and advances for operating, and pay you $200.00 per month for your assistance in helping to operate the hotel, and we will take 60 days to sell the lease and furniture.

"I will have the payments on the notes (Secured on Furniture) extended, and when sale is made you are to receive all money from the sale of the furniture, after deducting all monies due me on rent and furniture.

"Any time during the 60 days that you pay me all the money due on rent and furniture, I will turn over the hotel to you.

---

[1] This case was consolidated for trial below and for argument here with case No. 6177, Smith v. Pickford, 66 App.D. C. 206, 85 F.(2d) 705, decided this day. The record in each case was by all parties offered in evidence in the other, and was made part of the bill of exceptions.

[2] There were two leases purchased. One was executed on April 30, 1919, between Pickford as lessor and the Hotel Lafayette Company, a Delaware corporation, as lessee, for a term to commence May 1, 1919, and to end April 30, 1931.

The other was executed on April 26, 1929, between Pickford as lessor and. the same lessee—it was a further lease of the same premises—for a term of eight years to commence May 1, 1931. With the consent of Pickford, the Hotel Lafayette Company on October 24, 1929, assigned both of these leases to Smith. Only the second lease is involved in this proceeding. At the same time that the leases were assigned to Smith, he purchased from the Hotel Lafayette Company the hotel furnishings.

"I will pay taxes due in September 1932.
"Yours truly,
"(Signed)   T. H. Pickford.

"I accept the above proposition and hereby transfer to you all my right, title and interest in the furniture and lease, and put you in possession of the hotel.

"(Signed)   Walter Fletcher Smith."
Smith apparently was desirous either of taking advantage of the 60-day provision in the foregoing agreement or of entering into a new contract for a lease of the hotel and for purchase of the furnishings thereof. It was in support of such an alleged new contract that he made his case below. The case made was this: F. E. Lucas testified that: On December 1, 1932, in the course of negotiations carried on by him between Smith and Pickford with respect to the hotel and its furnishings, he submitted to Pickford a letter as an offer in writing from Smith. Pickford with his pen made a few corrections in the letter. He (Lucas) rewrote it embodying these corrections, and submitted it to Pickford, who said that it was satisfactory. It was in the following form:

"Hotel Lafayette, Sixteenth St. at Eye
Northwest, Washington, D. C.
"December 1, 1932.

"Mr. F. E. Lucas,
"Lafayette Hotel, Washington, D. C.

"Dear Mr. Lucas:

"You are hereby authorized to take such steps as may be necessary to assure Mr. Pickford that a deposit of $10,000 will be made by me for the following purposes.

"I will take a ten year lease of the Hotel Lafayette in the name of a corporation, said lease to begin as of December 1, 1932, at a rental of $2,500 per month, said rent to begin as of January 1, 1933. The lease is to contain an option to renew for another term of ten years at a rental to be agreed upon at least six months prior to the expiration of the original term.

"I will pay the rent for the months of January and February 1933 amounting to $5,000 at the time of executing the lease and will also pay the two payments for those months on the furniture account amounting to $500, making a total of $5,500 to be paid by me at the time of executing the lease. It is understood that there is to be no rental for the month of December 1932.

"Mr. Pickford is to pay the taxes for the year 1933. Beginning with the year 1934 I am to pay all of the taxes.

"There is now a balance due Mr. Pickford on the furniture and fixture account amounting to $24,453.00 and I owe back rent for the months of July, August and September 1932 amounting to $8,000, making a total of $32,453.00. This amount I will pay at the rate of $250 per month, each payment to include interest from date, it being understood that the payments for the months of January and February 1933 shall be made on the execution of the lease.

"I also agree to reimburse Mr. Pickford $4,100 for money he has expended during the time he has operated the hotel and will pay this at the rate of $100 per month beginning January 1933 and continue all payments on a monthly basis. It is understood that I am to have the option of making a cash settlement of all unpaid balance at any time upon making such payment as shall be satisfactory to Mr. Pickford.

"You are authorized to call upon such creditors as may be necessary to acquaint them with the foregoing agreement between Mr. Pickford and me.
"Very truly yours,

"_____  _____."

Lucas also testified that Smith had signed one copy of this corrected letter. There was no testimony that Pickford signed either copy. Smith testified that: On December 5 or 6, 1932, he went to Cuba to obtain funds, and before leaving called Pickford on the telephone. He told Pickford that he was going to Havana to get funds in keeping with the agreement Lucas had made for him, to take back the hotel, and Pickford said it was all right, that he was very glad to have him take it back. Smith testified further that an unsigned letter addressed to F. E. Lucas dated December 1, 1932, and an unsigned carbon copy of a letter likewise addressed and dated were the "completed proposition" upon which he relied; and he introduced in evidence the letter first above referred to, and the letter above printed. [These letters are referred to in the record as Exhibits 25 and 53.]

One of Pickford's defenses was a denial that he had entered into the asserted contract. He testified that: Lucas had come to see him many times. The first of

the foregoing two letters was presented to him by Lucas, and he made corrections therein, but he could not accept the propositions that had been made. He never saw anyone thereafter, and he never heard from anyone that the propositions as changed would be acceptable to Smith.

The trial court found:

"I find that Pickford did not agree with Lucas or with any one else, either in writing or orally, that he would enter into a contract as outlined in either of said drafts of letters dated December 1, 1932, marked Exhibits 25 and 53. [Finding No. 12]"

With the evidence in conflict as above set forth, we cannot disturb this finding. A chancellor's "finding ought not to be set aside, unless it appears that there has been an error in law or a conclusion of fact unwarranted by the evidence." Castleman v. Avignone, 56 App.D.C. 253, 256, 12 F.(2d) 326. See also: Williams v. Foster, 62 App.D.C. 14, 63 F.(2d) 893, certiorari denied 289 U.S. 749, 53 S.Ct. 692, 77 L.Ed. 1494; Snow v. Snow, 50 App.D.C. 242, 270 F. 364, and cases therein cited. In this view we think it unnecessary to pass upon two additional points raised in defense by Pickford, one that the asserted contract does not satisfy the Statute of Frauds, and the other that it is too indefinite to be a proper foundation for an action for specific performance.

■■ 2. Concerning the foreclosure sale: When Smith, by virtue of the antecedent transactions above referred to, purchased the leases and furnishings of the Hotel Lafayette, he paid for them $50,000 in cash and $47,000 in promissory notes, and, as indicated above, Pickford had become the owner and holder of such of these as represented an unpaid balance. To secure the payment of balance of the purchase price represented by the notes, Smith had executed two trust deeds, one upon the leases and the other upon the furnishings. The trustees were Chester A. Bennett and Elwood H. Seal. The trust deed upon the furnishings provided that upon default in the payment of the interest or principal of the notes, the trustees were "to take immediate possession of said goods and chattels and personal property, wheresoever the same may be found, and to sell the same at public auction, upon such terms and after such public notice as the said parties of the second part [the trustees], or the survivor of them in the execution of this trust, shall deem advantageous and proper * * *." The trust deed upon the leases contained substantially the same provision. On December 6, 1932, Pickford in writing notified the trustees of default on Smith's part, and as holder of the notes directed them to advertise the lease [that is, the unexpired term of the second lease] and hotel furnishings for sale under the terms of the trust deeds, and demanded an immediate sale. Thereupon the trustees caused to be published in the Washington Times and Washington Herald, commencing December 7, 1932, a notice of auction sale of the security in question to be held on December 16, 1932, at the office of Thomas J. Owen & Son in Washington, D. C. It was announced in the notice that the terms of sale were cash, the security to be sold as an entirety, the purchaser to deposit $5,000 at the time of the sale, with ten days allowed to complete the purchase. Pursuant to this notice the sale was held and Pickford bought the security for $10,-000. The furnishings had been previously appraised at $17,693.25 by C. G. Sloan & Co., Inc., general auctioneers and appraisers—in a separate proceeding.[3] Seal testified that in his opinion the lease had no value. On November 12, 1932, Pickford had entered into an agreement to lease the hotel to the defendant J. L. Ford, and also to sell Ford the furnishings. This agreement was subject to the 60-day provision of the agreement of October 7, 1932, but that period expired December 6, 1932, the date Pickford made demand for the foreclosure sale. Immediately upon purchasing the security Pickford put Ford into possession, and thereafter carried into effect the agreement with him—upon terms of $30,000 per annum as rental and $32,-500 as the purchase price of the furnishings.[4]

Smith urged against the sale that the notice was too short, the terms burdensome, the price inadequate. He pointed to the amount for which the security was "knocked down" to Pickford as compared with the appraised value thereof and the price agreed to be paid by Ford. He relied upon the testimony of Bennett and Seal, the trustees, that they followed the

---

[3] An attachment proceeding in case No. 6477 referred to in footnote 1.

[4] The defendant National Savings & Trust Co., a corporation, was trustee under a deed executed by Ford to secure his performance of this agreement.

judgment of Pickford as to the time and terms of the sale, and upon his own testimony that he had no notice of the sale. Upon his own testimony and that of Lucas that he had been granted by Pickford a 10-day extension of the 60-day provision of the agreement of October 7, 1932, Smith asserted that he was thus lulled into a sense of security with respect to any disposition of the property prior to December 17, 1932. Pickford, in support of the sale, asserted that: No 10-day extension had been granted—there was testimony to this effect by him and by one Hodgkins; whether or not Smith had notice of the sale, his attorneys had—there was testimony to this effect by one Brashears; as to the trustees following his judgment, they did not; in any event the price was adequate, the terms were not burdensome, the notice was sufficient; and the trustees were not shown to be guilty of misconduct. There was testimony by Ford that he knew of the foreclosure sale, but that he had nothing to do with it, and had no arrangement with Pickford not to go.

The trial court found:

"It was contended by the plaintiff that as the expiration of the 60-day period approached Pickford agreed to extend for ten days, or represented that he would wait for ten days, or for some such period, the time within which Smith might make a payment in accordance with the terms outlined in the draft of letter, Exhibit 53, or within which Smith might pay such sums as would be due from him under the contract of October 7, 1932. I find that no such extension was agreed to or .representation made by Pickford. [Finding No. 13]

" . . . There was no conspiracy, agreement or arrangement between Pickford and Ford to depress or dampen bidding at said sale. Ford at no time considered said auction sale as a means of acquiring title to said chattels or a lease on said property; he did not have the ability to command cash to put into the property in excess of the $5,000 called for by his contract with Pickford, and he was unwilling to pay rental at the rate called for by the lease to Smith. The trustee Bennett, did not bid at said sale. Pickford had no fraudulent intent concerning said sale and committed no fraudulent acts in connection with it nor did the trustees. [Finding No. 16]"

In the opinion of the trial judge appeared the following: ·

"The furniture was appraised at $17,-693.25. It was sold on long time credit for $32,500 as part of a transaction which involved a new lease. The old lease had over six years to run at the time of the agreement of October 7. The rental under the old [new] lease was $125 a month less than under the new [old], or $1,500 less a year. Pickford had to pay a 3% commission on the new rent, or $900 a year. Thus the new lease was worth $2,400 less per year to Pickford than the old, or about $15,000 less for the unexpired portion of the old lease. Smith was relieved of liability for $24,000 due on the furniture for which Pickford hoped to realize $17,500 ($32,500 less $15,000)." [5]

A foreclosure sale may be set aside where there has been misconduct on the part of the trustees affecting its fairness, or where the trustees have violated the terms of the trust or where the consideration is grossly inadequate. . Anderson v. White, 2 App.D.C. 408. But again we cannot say that the facts as found by the court in the instant case are without proper support. The evidence was in conflict on the question of the 10-day extension. The trust deeds required no notice to Smith, and in any event we cannot say that the trial court was not warranted in accepting the testimony that Smith had notice through his counsel. While there was foundation for the contention of . Smith that the trustees followed Pickford's judgment as to the terms and time of the sale when their judgment should have been independent, still if this did not affect the ultimate fairness of the sale, it cannot control the case. As to the price, the discrepancy between the appraised value of the furniture and the amount paid by Pickford at the foreclosure sale is not alone sufficient to characterize the latter as unfair; the discrepancy between the amount paid by Pickford and his sale price to Ford is adequately explained in the opinion of the trial court; there was no showing that bids better than the one made by Pickford were available. The trust deeds gave the

---

[5] The substitutions in brackets are supplied. Comparison of the two leases as described in the record clearly indicates that the meaning of the court was that indicated by the supplied words. The rental under the old lease was $2,625 per month (R. 130), and the rental under Ford's lease, $2,500 per month (R. 166).

trustees the broadest possible authority in respect of the nature of the notice and the time and terms of the sale so that it cannot be said that there was any violation of the terms of the trust deeds. Apparently the trial court did not under all the circumstances of the case regard the terms as burdensome. The record is voluminous. The trial court obviously gave careful attention to the case. We think its conclusions should be upheld.

Accordingly, on both aspects of the case, the decree below is

Affirmed.