### HAZEN et al. v. HAWLEY.*
### No. 6553.

United States Court of Appeals for the District of Columbia.

Decided Aug. 31, 1936.

*Writ of certiorari denied 57 S. Ct. 315, 81 L. Ed. ——.

E. Barrett Prettyman, Corp. Counsel, Vernon E. West, Asst. Corp. Counsel, Leslie C. Garnett, U. S. Atty., and David A. Pine, Asst. U. S. Atty., all of Washington, D. C., for appellants.

Max Tendler, Myron Melvin Cohen, and Walter Schaffner, all of Washington, D. C., for appellee.

Before MARTIN, Chief Justice, and GRONER and STEPHENS, Associate Justices.

STEPHENS, Associate Justice.

This is an appeal from a decree of the Supreme Court of the District of Columbia, filed June 17, 1935, ordering the appellants, as the Zoning Commission of the District of Columbia, to vacate the zoning of property of the appellee as "B Restricted", which forbids the erection of an apartment house, and to re-zone the property "to Area 'B' or Area 'C', and so as to permit the erection thereon of an apartment house."

The appellee's property, Lot 830 in Square 2205 in the District of Columbia, is located at the northeast corner of Calvert Street and Woodley Place. It extends from Calvert Street approximately 164 feet northerly along Woodley Place, thence easterly 178 feet to Cathedral Avenue, thence southerly along Cathedral Avenue 239 feet, and thence westerly 117 feet to the place of beginning; it contains 28,542 square feet. On the south of the property is the Calvert Street Bridge. From its Woodley Place frontage the land slopes sharply downward to Cathedral Avenue, the difference in elevation being about 62 feet. The appellee acquired the northerly portion of the property in 1912 and the balance in 1917. Prior to the purchase of the second parcel the appellee and her husband, who is now deceased, constructed on the northwest corner of the northerly portion a four-story single family dwelling. This, the only improvement, is still on the property. There was no zoning law applicable to the District of Columbia until 1920, but in that year Congress passed "An Act To regulate the height, area, and use of buildings in the District of Columbia and to create a Zoning Commission, and for other purposes." Act of March 1, 1920, 41 Stat. 500 (D.C.Code 1929, T. 25, §§ 521–

530). By the original regulations promulgated thereunder, the appellee's property was included in the Area "B" zoning district. As defined by Sec. XVI of the Zoning Regulations, this zoning permitted a lot occupancy, in respect of the appellee's property, not exceeding approximately 69 per centum, and did not forbid the erection of an apartment house. In 1924, by the promulgation of Regulation XVI (a), as amended, a " 'B' restricted-area district" was created which retained the lot occupancy requirements of Area "B", but which forbade the erection of apartment houses, and the appellee's property was zoned therein.[1] Similarly zoned were the east and west sides of Woodley Place from Calvert Street to Cathedral Avenue, a distance of two blocks, the north and south sides of Woodley Road, from Woodley Place to Cathedral Avenue, a distance of one block, the north and south sides of Woodley Road, from its intersection with Woodley Place to the point where a different zoning of Connecticut Avenue commences, a distance of about one-half a block, the south side of Cathedral Avenue, from Woodley Place to the point where a different zoning of Connecticut Avenue commences, a distance of about one-half a block, and the west side of Cathedral Avenue from the point where it passes under the Calvert Street Bridge to the point where, as it turns northwesterly toward Connecticut Avenue, it intersects Woodley Place, a distance of about two blocks. The entire area described comprises an elongated zoning "island", about two blocks in length and a block and a half in width.

In March, 1929, the appellee petitioned the Zoning Commission to re-zone her property to Area "B". This petition the Commission denied. Later in the same year the Building Inspector of the District of Columbia denied an application made by the appellee for a permit to build an apartment house. In October, 1933, the appellee again petitioned for re-zoning, in this instance to Area "C" which, like Area "B", did not forbid the erection of an apartment house, but which was less restrictive than Area "B" in its lot occupancy requirements. This petition the Commission also denied, "but without prejudice against a new hearing".

In September, 1934, the appellee commenced the proceeding now before the court by filing her bill of complaint in equity in the Supreme Court of the District of Columbia.[2] The bill, in brief, charges that the zoning of the appellee's property in the " 'B' restricted-area district" bears no relation to the protection of the public health, the securing of the public safety, or the protection of property in the District of Columbia, within the meaning of the Zoning Act, and is arbitrary and contrary to the provisions of the Fifth Amendment to the United States Constitution as a deprivation of property without due process of law, and a taking of private property for public use without just compensation. Issue was joined by the appellants. At the trial maps, photographs, and documentary exhibits were introduced in evidence, and the testimony of six witnesses, including the appellee, was heard in support of the case for the appellee, and the testimony of two witnesses for the appellants.

At the close of the case the trial court made extensive findings of fact. These, so far as here material, are set out in terms below:

"II. The more northerly portion of the property involved herein was acquired by the petitioner and her now deceased husband through purchase in 1912, and they immediately built thereon, and fronting on Woodley Place, a handsome four-story private residence containing spacious halls, sitting room, dining room, kitchen and butler's pantry, library, drawing room, ballroom, five bedrooms, large porches at the back overlooking the grounds and gardens, servants' quarters, and garage. Between 1912 and 1917 they purchased the remaining portion of the property now known as Lot 830 in Square 2205, and took full advantage of the topography of the land by landscaping it with masonry retaining walls, shrubbery, trees, gardens, fountains,

---

[1] Regulation XVI(a), as amended, provides as follows: "In the 'B' restricted-area district the minimum dimensions of yards and courts and the maximum percentage of lot occupancy shall be the same as for the 'B' area district, except that hereafter no building shall be erected for use as an apartment house, or a flat, or a hotel, nor shall any existing building be enlarged for use as an apartment house, a flat, or a hotel, nor shall any building hereafter erected be used for these purposes. (June 24, 1924.)"

[2] Now named the District Court of the United States for the District of Columbia. Public No. 796, 74th Congress, approved June 25, 1936, c. 804, 49 Stat. 1921.

and steps and walks leading from the house and Woodley Place throughout the grounds, thereby making it a highly desirable and attractive residence, in keeping with the then character of the neighborhood. With the exception of a relatively short period, the property was occupied by the petitioner and her husband as their residence until his death in 1929, and the petitioner now owns the property and has since continued to occupy it as her residence.

\* \* \* \* \* \*

"V. The area, including petitioner's property, thereby [by Regulation XVI (a)] zoned 'B Restricted', is comprised of Squares 2205, 2206, and approximately the east halves of Square 2204 and Square 2208, and there is included in this area merely the west and east sides of Woodley Place from Calvert Street to Cathedral Avenue, a distance of two blocks; the north and south sides of Woodley Road from Woodley Place to Cathedral Avenue, a distance of one block; and the west side of Cathedral Avenue, a distance of two blocks. This area includes approximately three city blocks and constitutes but a minute section carved out of a vast apartment house area.

"VI. At the time the petitioner and her husband purchased the said property and built their home thereon, Woodley Place extended for a distance of but one block in a northerly direction from Calvert Street, and the northerly portion of the street had been improved, as had Calvert Street between Woodley Place and Connecticut Avenue and Connecticut Avenue from the Taft Bridge northward across Calvert Street up to Woodley Road, with the substantial homes of people occupying positions of social and political prominence in the community.

"VII. Woodley Place has, in more recent years, been extended another block to the north from Woodley Road to Cathedral Avenue, and the northerly portion of the block in which the petitioner's property is located has been improved with row houses, as has all of the extended portion of Woodley Place. These row houses are of a relatively inexpensive type of construction, designed for families of modest means and income and stations of life, thereby effecting a change in the general character of the neighborhood. An even greater change, however, has resulted from the re-zoning of the major portion of the two blocks of Connecticut Avenue northward from the Taft Bridge to Woodley Road, all within a block of petitioner's property, to 'First Commercial', and a large number of fine private houses within those two blocks, hereinbefore referred to in Finding VI hereof, have either been converted into, or torn down to make room for, small buildings housing restaurants, night clubs, drug stores, grocery and meat markets, rooming and boarding houses, delicatessen stores, liquor shops, millinery and dress shops, beauty parlors, newsstands, flower shops, laundry agencies, etc. That re-zoning included the triangular piece of property diagonally across Calvert Street to the southwest from the petitioner's property and within 100 feet thereof, the same being the southeast corner of Calvert Street and Connecticut Avenue. The only portion of the two blocks of Connecticut Avenue from Taft Bridge to Woodley Road which has not been re-zoned to 'First Commercial' is the southwest corner of Calvert Street and Connecticut Avenue, which property is owned by the United States.

"VIII. Woodley Place has become and is now a thoroughfare for automobile traffic for those automobiles, among others, proceeding from Calvert Street Bridge to upper Connecticut Avenue and Woodley Road; Woodley Place has been constituted by the Traffic Bureau of the District of Columbia a one-way street; automobiles proceeding from the Calvert Street Bridge to upper Connecticut Avenue use Woodley Place as a 'short cut' to avoid the traffic lights and traffic at Calvert Street and Connecticut Avenue, and there is a definite promise of a new increase of vehicular traffic on Woodley Place with the completion of the New Calvert Street Bridge, which is now under construction, and the alteration and widening of Woodley Place at its intersection with Calvert Street to a width in excess of 130 feet, which widening of Woodley Place is admitted by the defendants to be part of the program included in the construction of the new Calvert Street Bridge. The street cars of the Capital Traction Company pass at frequent intervals on Calvert Street before petitioner's property.

"IX. Petitioner's property is located in the heart of an area extensively occupied by hotels and apartment houses. The areas generally immediately to the northwest, west, south and east of petitioner's property are zoned to permit the erection thereon of

apartment house buildings, and are, to a large extent, improved with apartment house buildings. The land adjacent to the east approach of the Calvert Street Bridge is zoned 'First Commercial' and the stores of small shopkeepers are erected thereon. The land adjacent to the south approach to the Taft Bridge is zoned to permit of the erection of apartment houses, and there are concentrated within the immediate vicinity of that approach a large number of Washington's largest and finest apartment house properties.

"X. Petitioner's property having frontage on Calvert Street is in the sole area now existing upon the lines of the Capital Traction Company from the downtown business section to the District line at Chevy Chase Circle, which is so zoned as to prohibit the erection of an apartment house. All of the property extending along Connecticut Avenue from K Street, Northwest, to Chevy Chase Circle, and along Calvert Street from Eighteenth Street past Connecticut Avenue, with the exception of petitioner's property and Lot 826 in Square 2204, which is at the northwest corner of Calvert Street and Woodley Place, with a frontage of only 30 feet on Calvert Street, is zoned to permit thereon the construction of apartment houses.

"XI. Under the present zoning of the area involved herein, lodging or boarding houses are permitted, and any residence in the area existing prior to June 24, 1924, may be altered and used as an apartment house, and the majority of the houses in this area may be so altered and so used.

\* \* \* \* \* \*

"XIV. The property involved herein is currently assessed for taxation by the District of Columbia at $58,000.00, $20,000.00 thereof being allocated to improvements and the remaining $38,000.00 to land. The assessed valuation for the year 1929 and subsequent years was substantially higher. Taxes on this property approximate $1,000.-00 a year. The petitioner has, during the course of the past several years, made repeated attempts to lease the property involved herein, either furnished or unfurnished, and has engaged the services of various real estate brokerage firms in her attempts to do so. Her endeavors to lease the property have been unsuccessful because the neighborhood has so changed that it is no longer considered desirable by persons having the need for such a home and the means with which to maintain it. The one offer received by the petitioner for her home was by a person who desired to lease it for use as a boarding house, but that offer was for a relatively nominal amount and was predicated upon the making by the petitioner of extensive and expensive alterations, including changes in partitions, installation of additional bathrooms, etc. The petitioner is, accordingly, compelled to continue to occupy the residence at an annual loss of an amount in excess of $5,000.-00.

"XV. Although the erection of row houses facing on the Woodley Place and Cathedral Avenue frontages of the petitioner's property is permissible under the present zoning regulations, such a development would be unfeasible from a financial standpoint and highly undesirable from an aesthetic standpoint. Any such houses which might be erected on the Woodley Place frontage, except for those which might be built on such ground already filled and shored, would have to be stilted up because of the topography of the ground, and a considerable amount of excavating would have to be done to permit of the building of row houses down below on the Cathedral Avenue frontage. Both operations would be expensive and would necessitate the pricing of such houses on a basis which would be out of line with similar houses on Woodley Place and Cathedral Avenue built on level ground. The roofs of any houses erected on the Cathedral Avenue frontage, 62 feet below the Woodley Place frontage, would necessarily be below the ground floors of any houses erected on the Woodley Place frontage, so that smoke and odors emanating from the chimneys of the Cathedral Avenue houses might be blown directly into the windows of the Woodley Place houses. It would be impossible to build an alley between the two rows of houses which would be accessible other than by foot to either Cathedral Avenue or Woodley Place. The cost of erecting an apartment house would not be increased by reason of the topography of the land.

"XVI. The property involved herein is a desirable site for the location of an apartment house and the erection of an apartment house on the property would not be out of harmony with the character of improvements in the immediate neighborhood and would not adversely affect the health, safety, convenience, property, and general welfare of the inhabitants of that part of the city.

222

"XVII. There is an extreme need for additional housing facilities in the District of Columbia, and there is a shortage of available apartments, and, as a result thereof, rentals for apartments are disproportionately high."

Upon the findings of fact the trial court then made the following conclusions of law:

"I. That Zoning Regulation XVI (a), as applied to petitioner's property, bears no relation to the health, safety, welfare or property of the community.

"II. That Zoning Regulation XVI (a), as applied to petitioner's property, is unreasonable, arbitrary and capricious.

"III. That petitioner is being deprived of the use of her property without due process of law.

"IV. That Zoning Regulation XVI (a), as applied to petitioner's property, is null and void."

The court then decreed that the appellants ". . . vacate and annul the zoning . . . of Lot 830 in Square 2205 as 'B Restricted' . . ." and that the appellants ". . . re-zone Lot 830 in Square 2205 to Area 'B' or Area 'C', and so as to permit the erection thereon of an apartment house."

The assignments of error, as argued in the briefs, present the following questions:

■■ I. Did the trial court properly find that the classification of appellee's property in the " 'B' restricted-area district", forbidding the erection of an apartment house, was arbitrary: Under the rule settled in this jurisdiction, while we are not absolutely bound by a chancellor's findings of fact, we do not disturb them on appeal unless upon an examination of the evidence they are clearly wrong. Dear v. Guy, 64 App.D.C. 314, 78 F.(2d) 198; Pollock v. Jameson, 63 App.D.C. 152, 70 F.(2d) 756; Rhoderick v. Swartzell, 62 App.D.C. 180, 65 F.(2d) 813, certiorari denied 290 U.S. 677, 54 S.Ct. 100, 78 L.Ed. 584; Matson v. Rusch, 61 App.D.C. 184, 59 F.(2d) 360. See, also, United States v. United Shoe Mach. Co., 247 U.S. 32, 41, 38 S.Ct. 473, 62 L.Ed. 968. We have examined the record with care. We cannot say from the evidence that the findings of the trial court are clearly wrong. On the contrary there is substantial evidence to support them.

■ II. Should the bill have been dismissed because of an adequate remedy at law: The position of the appellants is that there was an adequate remedy at law by petition for a writ of mandamus directed against the Building Inspector of the District of Columbia to compel issuance of a building permit for an apartment house. Euclid v. Ambler Realty Co., 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303, 54 A.L.R. 1016, determines this question in favor of the appellee. The distinctions sought to be made by the appellants are, we think, not well taken.

■ III. Should the bill have been dismissed because of an implication in the decree that Area "B" zoning would be reasonable: The point of view of the appellants apparently is that: The sole question before the trial court was whether the Commission's denial of Area "C" zoning was arbitrary. Implicit in the decree directing a re-zoning of the appellee's property to Area "B" or Area "C" is a finding that an Area "B" zoning would be reasonable, from which it follows that the denial of Area "C" zoning was not arbitrary. Therefore the bill should have been dismissed.

There is in the appellants' premise that the sole question before the trial court was whether the Commission's denial of Area "C" zoning was arbitrary, the erroneous assumption that the appellee's petition before the Commission presented a single issue, to wit, lot occupancy requirements, and that hence this was the sole issue presented by the bill—an assumption, it is to be noted, contrary to the appellants' position elsewhere in their brief that the trial court had before it also an issue upon the propriety of an apartment house development of the appellee's property. So far as here material, three types of zoning districts exist under the regulations—Area districts, prescribing lot occupancy requirements only, use districts, stipulating permitted use only, and so-called restricted-area districts, which embrace a combination of use and lot occupancy requirements.[3] In Garrity v. District of Columbia, No. 6365, 86 F.(2d) 207, decided this day, we uphold, *inter alia,* the contention of the Zoning Commission therein made that it had power in the same regulation which defined an area-district also to limit use. The " 'B' restricted-area district",

---

[3] The regulations define also height districts.

whose application to appellee's property is complained of in the instant case, combines a restriction against use for apartment houses with the lot occupancy provisions of Area "B." When, therefore, the appellee filed her petition in 1933 asking the Zoning Commission to vacate the zoning of her property in the " 'B' restricted-area district" and to re-zone it in Area "C", she was in reality, and primarily, asking to be relieved of the use requirements of the " 'B' restricted-area district" which forbade apartment houses, and also, but contingent upon an affirmative ruling upon her request just described, to have her property zoned in Area "C"; that is to say, she was asserting to the Commission that if she was found entitled to erect an apartment house upon her land, the suitable lot occupancy requirements would be those of Area "C". And the effect of the Commission's denial of the appellee's petition was at least to continue in respect of her property the use restriction she had sought to be relieved of, and whether this was reasonable the petitioner had a right to have determined by the trial court. Therefore, the appellee's bill should not have been dismissed. It is to be noted that in view of directions below that the decree be modified, the reasonableness of the continuation of the use restriction against apartment houses is the only question determined by the judicial proceedings.

IV. Should the bill have been dismissed because there was a failure by the appellee to exhaust an administrative remedy: Appellants apparently urge that since the appellee had petitioned the Zoning Commission not for an Area "B" zoning in the alternative, but merely for an Area "C" zoning, there was no exhaustion of appellee's administrative remedy in respect of Area "B" zoning, and also no exhaustion of such remedy in respect of Area "A" zoning—which is more restrictive than Area "B" in lot occupancy requirements, but which also permits apartments houses.[4] Supporting this proposition appellants assert that the Commission's denial of the appellee's petition "without prejudice against a new hearing" meant that the Commission would entertain and favorably act upon a petition for an apartment house development of the appellee's property, provided she petitioned for some other lot occupancy requirements than those of Area "C"; and, argue the appellants, since there was no application on the part of the petitioner for a change in lot occupancy requirements to any but those of Area "C", the Commission could have had no hearing upon the propriety of an apartment house development in respect of the lot occupancy requirements of Areas "A" or "B" and, therefore, there never was exhaustion of the administrative remedy in respect of an apartment house development under the lot occupancy requirements of those two Areas. We think this argument not open to the appellants. They cannot take the position that the Commission ruled against all apartment house development and that this was not arbitrary—to defeat the bill on the merits, and then argue that the Commission ruled in favor of apartment house development, if applied for in Areas "A" or "B"—to defeat the bill procedurally. The appellants are the Zoning Commission, and we think they have definitely characterized their ruling by their position on the merits. That position the trial court found arbitrary, and that finding we cannot, as above pointed out, overturn. In any event, whether or not there was an administrative hearing upon Area "A" and Area "B" lot occupancy requirements for an apartment house is immaterial in our final disposition of the case, because under directions below to modify the decree, the case is in effect remitted for hearing by the Commission on the question of what lot occupancy requirements are reasonable for an apartment house development of the appellee's property.

■ V. Do the findings of fact support the decree: There is no finding of fact in respect of the reasonableness of either the "A", "B" or "C" Area lot occupancy requirements for the appellee's property. There was insufficient evidence on this subject for a finding. Nevertheless, the decree, in addition to ordering vacation of zoning of the appellee's property in the " 'B' restricted-area district", further ordered that the Commission re-zone appellee's property "to Area 'B' or Area 'C', and so as to permit the erection thereon

---

[4] Appellants' position here seems inconsistent with that discussed in III *supra*. They seem there to rely upon an implication in the decree that Area "B" zoning would be reasonable, this for the purpose of asserting that therefore denial of Area "C" zoning was not unreasonable, but here to denounce, on the ground that there had been no Commission hearing on Area "B" zoning, the validity of the very implication upon which they have just relied.

of an apartment house." Because there was no finding of fact in respect of lot occupancy requirements reasonably applicable to an apartment house development, and no evidence sufficient for a finding, the decree must be modified so as to permit the Commission to re-zone the appellee's property to Area "A", Area "B", or Area "C" after a hearing on the reasonableness of the lot occupancy requirements of those Areas respectively for an apartment house development of the appellee's property.[5]

■■■ VI. Did the court properly rule on the admissibility of evidence objected to: In the course of the trial the appellee displayed to a doctor certain pictures identified as pictures of a projected apartment house which the appellee had planned to build on her property, and, over the objection and exception of the appellants, the doctor was permitted to express his opinion on the question ". . . what effect, if any, the erection of an apartment house such as that, or a modern apartment house, would have on the public health of the territory adjacent to that property?" The objection was on two grounds, first, that the effect upon health was a matter for the judicial notice of the court, and not for evidence, and second, that the question called for an answer in respect of a particular apartment house, whereas the issue before the court was not whether a particular apartment house, which perhaps might not be erected, would be harmful to health, but whether any apartment house that could be built upon the appellee's property, if re-zoned so as to permit such construction, would be so harmful. The first ground of objection is without merit. Whether in the particular location an apartment house would be deleterious to health is a subject clearly within the field of expert testimony. The second objection is technically well taken. While the effect of a particular apartment house on the health of the neighborhood might remotely have some bearing upon the effect of any apartment house, its probative force is so remote as to render the evidence inadmissible for lack of materiality. But we think it would be unjustifiable to conclude that the admission of this evidence was harmful error, requiring reversal.

■ The appellee offered in evidence certain pencil sketches of a projected apartment house for her property. Upon the objection by the appellants that these were not admissible for the reason that the issue before the court was not whether a particular apartment house ought to be permitted on the appellee's property, but whether any ought, the court in this instance sustained the objection. Appellee then re-offered the sketches to prove that they were before the Zoning Commission upon the hearing of the appellee's 1929 petition for re-zoning. Objection was again made, but overruled and exception taken. Again we see no materiality in the evidence. The fact that these pencil sketches were before the Commission at the 1929 hearing had no apparent bearing upon any of the issues before the trial court in the instant case. But again we think that it would be unjustifiable to conclude that the error was harmful.

It is therefore ordered that the decree of the Supreme Court of the District of Columbia be modified in accordance with our directions in V, *supra*, and it is further ordered that as so modified the decree be, and the same is, hereby

Affirmed.

---

[5] There is no issue in the case in respect of Area "D." The lot occupancy requirements thereof are, in respect of apartment houses, the same as those of Area "C." See Sec. XVIII of the Zoning Regulations.