454 F.2d 899
 147 U.S.App.D.C. 56
 NATIONAL LIFE INSURANCE COMPANY, a corporation
v.
Jerome SILVERMAN et al., Appellants.
CARROLL ARMS ASSOCIATES, a District of Columbia Limited
Partnership, et al., Appellants,
v.
NATIONAL LIFE INSURANCE COMPANY, a Vermont Corporation,
a/k/a National Life of Vermont, et al.
 Nos. 23594, 23595.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued June 19, 1970.
Decided March 23, 1971.
On Reconsideration En Banc Dec. 9, 1971.
 
 1
 Mr. Edward L. Genn, Washington, D. C., for appellants.
 
 
 2
 Mr. John C. Joyce, Washington, D. C., with whom Mr. E. Tilman Stirling, Washington, D. C., was on the brief, for appellees. Mr. William W. Beckett, Washington, D. C., also entered an appearance for appellee National Life Insurance Company.
 
 
 3
 Before BAZELON, Chief Judge, WRIGHT, Circuit Judge, and MATTHEWS,* Senior District Judge, U. S. District Court for the District of Columbia.
 
 MATTHEWS, Senior District Judge:
 
 4
 This litigation centers around a foreclosure sale of the Capitol Hill Hotel by trustees pursuant to a deed of trust. From a judgment of the United States District Court upholding the foreclosure and awarding possession of the hotel to the purchaser at the sale, the prior owners appeal. They are: Carroll Arms Associates (hereafter "Carroll Arms"), a District of Columbia limited partnership, and its general partners, Jerome Silverman and his wife, Greta Silverman. The appellees are the National Life Insurance Company (hereafter "National Life"),- the party secured by the deed of trust on the hotel property-, and Thomas J. Owen and Robert W. Kidwell, the trustees who made the foreclosure sale under such deed of trust.
 
 
 5
 As grounds for this appeal Carroll Arms assert that the district court erred (1) in granting partial summary judgment in favor of National Life as to the issue of usury, (2) in holding that the District of Columbia Money Lenders Act exempts National Life from obtaining a license as a money lender, (3) in striking the demand of Carroll Arms for a jury trial, and (4) in the standards used in its fact-finding determinations in respect of the trustees.
 
 
 6
 We relate the background of this litigation. National Life made a loan of $1,300,000 to Carroll Arms, then owners of the hotel property, the loan being evidenced by a promissory note dated November 30, 1967, signed by Mr. Silverman and his wife, the general partners of Carroll Arms. The purpose of the loan was to provide funds for refinancing the hotel property and for completely refurbishing and renovating the hotel, its restaurant and bar. In order to secure the payment of the $1,300,000 note, a deed of trust of the same date, also signed by the Silvermans, was placed on the real property of the hotel and on the chattels used in and about the hotel operation.
 
 
 7
 Carroll Arms has made no payment whatsoever to National Life since the day the $1,300,000 was loaned, and various requirements of the deed of trust have not been met.
 
 
 8
 On May 6, 1968 the trustees under the deed of trust, at the request of the noteholder, advertised the property for sale on May 21, 1968, and notified Carroll Arms accordingly. On May 17, 1968 counsel for Carroll Arms advised the trustees of an error in the advertisement relative to the amount of the deposit,[1] and simultaneously filed an action against National Life and the trustees challenging the proposed foreclosure.[2]
 
 
 9
 Recognizing the error in the advertising, the trustees cancelled the sale scheduled for May 21, and set June 13 as a new date for the sale. The advertisement containing the corrected deposit figure was placed in the Washington Star on June 1, 1968, and was published in 5 different issues over a period of 13 days. In addition to personal notice to Carroll Arms and the newspaper advertisements, notice of the proposed foreclosure sale was furnished to the socalled "Lusk Report" which is circulated to the top investors and real estate brokers in the Washington Metropolitan Area.
 
 
 10
 On the afternoon of Thursday, June 13, 1968, in front of the hotel the foreclosure sale itself was held. About 20 to 30 people were present. National Life, the noteholder, bid $900,000 and after several requests for other bids, the auctioneer declared the property sold to National Life. There was at least one other person present who exhibited a $25,000 check, $25,000 being the deposit specified in the June advertisements of the sale.
 
 
 11
 The day following the foreclosure sale, the trustees executed and delivered a deed conveying the hotel property to National Life as the successful bidder at the sale. On that same day, National Life requested Carroll Arms to vacate the hotel but this request was refused.
 
 
 12
 Thereafter National Life, treating Carroll Arms as a tenant at will pursuant to statute,[3] gave Carroll Arms notice to quit the hotel premises.[4] When they did not quit, National Life sued Carroll Arms in the Landlord and Tenant Branch of the District of Columbia Court of General Sessions for possession of the real estate, alleging that it was held without right by Carroll Arms. However, Carroll Arms interposed a plea of title. The Court of General Sessions, not having jurisdiction to try title, certified the action to the United States District Court in accordance with D.C.Code Sec. 16-1504 (1967 ed.). It was consolidated for trial with the action Carroll Arms had previously filed in District Court.
 
 THE JURY TRIAL DEMAND
 
 13
 A demand for a jury trial was made by Carroll Arms in each of the two consolidated cases. They claim that a jury trial was their right.
 
 
 14
 We refer briefly to the historical background of this claim. The United States Constitution, Article III, Section 2, provides: "The judicial Power shall extend to all Cases, in Law and Equity, * *" The Seventh Amendment to the Constitution guarantees the right of trial by jury in "Suits at common law."[5] Originally there was no blending together in one suit of legal and equitable remedies, but the "remedies in the courts of the United States" were either "at common law or in equity * * *" Lindsay v. First Nat. Bank of Shreveport, 156 U.S. 485, 493, 15 S.Ct. 472, 39 L.Ed. 505 (1895). At common law a jury trial was available as of right in an action brought at law; in suits in equity, on the other hand, questions of fact were determined by the court sitting without a jury.
 
 
 15
 Under the Federal Rules of Civil Procedure which in 1938 became effective for the District Courts of the United States provision is made for but one form of action, known as a civil action, and a litigant is allowed to assert and to have resolved in one civil action both legal and equitable claims. As stated in Rule 18(a) thereof a party "may join, either as independent or as alternate claims, as many claims, legal, equitable, or maritime, as he has against an opposing party."
 
 
 16
 Although the joinder of legal and equitable claims is allowed in one action, the Federal Rules safeguard the right to jury trial of legal issues. Rules 38 and 39.
 
 
 17
 Nevertheless, the 1938 merger of the federal courts of law and equity caused considerable uncertainty in the determination of jury trial rights. But clarification came with two Supreme Court decisions each growing out of the denial by a United States Court of Appeals of a petition for mandamus to compel a district judge to vacate his order striking a demand for trial by jury. Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959); Dairy Queen, Inc. v. Wood, 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962).
 
 
 18
 In Beacon Theatres the defendant had threatened to sue the plaintiff for treble damages on the ground that certain exclusive "first run" contracts plaintiff had with movie distributors violated the Sherman Act. But plaintiff beat the defendant to the court, seeking a declaratory judgment that its contracts were lawful and to enjoin defendant from bringing an antitrust suit against plaintiff and its distributors pending final resolution of plaintiff's action. Defendant answered, counterclaimed for treble damages, and demanded a jury trial on factual issues. The trial court, regarding the issues raised by the complaint as essentially equitable, ordered a separate trial of these issues before the court without a jury. The Supreme Court reversed and ordered the case submitted to a jury on the ground that where both legal and equitable issues are presented in a single case "only under the most imperative circumstances, circumstances which in view of the flexible procedures of the Federal Rules we cannot now anticipate, can the right to a jury trial of legal issues be lost through prior determination of equitable claims." 359 U.S. 510-511, 79 S.Ct. 957.
 
 
 19
 Significantly the Supreme Court stated in Beacon Theatres: "Our decision is consistent with the plan of the Federal Rules and the Declaratory Judgment Act to effect substantial procedural reform while retaining a distinction between jury and nonjury issues and leaving substantive rights unchanged." (Emphasis added.) 359 U.S. 508, 509, 79 S.Ct. 955, 956.
 
 
 20
 Dairy Queen involved a dispute about a written licensing agreement for the exclusive right to use the trademark "Dairy Queen" in a specified area. Plaintiffs alleged that defendant had breached the agreement as to certain payments due plaintiffs; that such breach resulted in cancellation of the contract; that defendant was contesting the cancellation and continuing to deal with the trademark despite plaintiffs' notice of cancellation; that to continue such business after the cancellation of the contract constituted and infringement of plaintiffs' trademark. The plaintiffs prayed for injunctive relief and an accounting to determine the exact amount owing by defendant to plaintiffs and a judgment for that amount. The defendant's answer included a denial that there had been any breach of contract, apparently based chiefly upon its allegation that the parties had entered into an oral agreement modifying the original written contract by removing the provision requiring minimum annual payments regardless of defendant's receipts. Defendant endorsed upon its answer a demand for a trial by jury.
 
 
 21
 Insofar as the complaint in Dairy Queen requested a money judgment the Supreme Court held that it presented a legal claim. The court concluded that "the district judge erred in refusing to grant [defendant's] demand for a trial by jury on the factual issues related to the question of whether there has been a breach of contract"; that since "these issues are common with those upon which [plaintiffs'] claim to equitable relief is based, the legal claims involved in the action must be determined prior to any final court determination of [plaintiffs'] equitable claims." 369 U.S. 479, 82 S.Ct. 900.
 
 
 22
 In analysis, the theory of these two cases seems clear. Neither party is entitled to a jury trial of an issue which is equitable; both are entitled to a jury trial of an issue which is legal. Where in a single case there are factual issues common to both legal and equitable claims, either party has a constitutional right to a jury trial on the legal issue, and to have that issue resolved by a jury before the court determines the equitable issue. (See discussion in Dairy Queen, 369 U.S. 472-473, 82 S.Ct. 894.) A concurring opinion in Dairy Queen states that the case "is nothing more than a joinder in one complaint of prayers for both legal and equitable relief," and that in "such circumstances, under principles long since established, Scott v. Neely, 140 U.S. 106, 110 [11 S.Ct. 712, 35 L.Ed. 358], the petitioner cannot be deprived of his constitutional right to a jury trial on the 'legal' claim contained in the complaint." 369 U.S. 481, 82 S.Ct. 901.
 
 
 23
 In deciding whether a pending action contains "legal issues" the court must consider the construction of the pleadings, and the relief sought. 369 U.S. 476-479, 82 S.Ct. 894.
 
 
 24
 We turn now to the first action in this litigation. It was filed by Carroll Arms against National Life and the trustees prior to the foreclosure, but after the advertising thereof had begun.
 
 
 25
 In the complaint the main allegation is that National Life and the trustees were without right to foreclose, and hence that any attempted foreclosure would be wrongful.
 
 
 26
 The alleged nonexistence of the right to foreclose is based upon two theories. The first theory is grounded on the allegations that the loan transaction was usurious, and that the lender (National Life) was required by law to have, but did not possess, a money lenders license, thus making the loan transaction illegal, and the intended foreclosure wrongful. The second theory rests on several allegations purporting to establish that there was no default, to wit: that "no sums" were "due the noteholder * * * and that in any event there has been a waiver thereof"; that National Life led Carroll Arms to believe "that adjustments would be made and were in fact to be made in the arrangements between the parties, and in this regard they did wilfully * * * misrepresent their intentions" to the end that National Life as noteholder "could obtain ownership of the plaintiffs' premises known as the Capitol Hill Hotel"; and that "at the time of the transactions by and between the plaintiffs, and defendant * * * in November 1967, it was known and understood by all of the plaintiffs herein that adjustments and modifications would be made and entered into."
 
 
 27
 It is further alleged by Carroll Arms in their complaint that, after they received notice from the trustees that they would proceed with a trustees' sale of the property, they advised both National Life and the trustees of their contentions as above set forth, all based on the premise that no right to foreclose existed. Carroll Arms also alleged that, notwithstanding the "clear and distinct knowledge" of National Life and the trustees of Carroll Arms' contentions, they determined to carry out the foreclosure. The efforts of National Life to obtain a foreclosure to satisfy the debt owing by Carroll Arms were characterized in the complaint as "wilful", "malicious", "fraudulent", "illegal", "unlawful", and the result of a "conspiracy".5a The activities of the trustees as to the intended foreclosure (in the face of Carroll Arms' contentions) were described in the complaint as "wilful, fraudulent, conspiratorial with the defendant corporation, and wrongful."
 
 
 28
 Besides the allegations of the complaint directed against both National Life and the trustees to the effect that the right to foreclose did not exist and hence that any attempted foreclosure would be wrongful and unlawful, there are assertions against the trustees in respect of their fiduciary duties. They are mostly general and conclusory. It is alleged that they "failed to exercise their independent judgment," and that their notices of the contemplated foreclosure were not so adequately distributed or published as to afford a fair sale. These assertions relate to fiduciary matters rather than to a wrongful foreclosure, and we discuss them later.
 
 
 29
 Now we consider the remedies sought by Carroll Arms in their complaint. They prayed for the following equitable relief: the enjoining of the foreclosure; the setting aside by the court of the entire loan transaction including the $1,300,000 note, the deed of trust, the notices of the prospective foreclosure, and all other documents and actions flowing from or pursuant to the deed of trust, and a declaration of their invalidity by the court.
 
 
 30
 In addition, Carroll Arms sought legal relief for an imminent and allegedly wrongful foreclosure, i. e., a foreclosure where no right to foreclose existed. They asked for damages against National Life and against the trustees "at least to the extent that the said trustees share in such decisions and actions."[6]
 
 
 31
 For a wrongful foreclosure the borrower has alternative and inconsistent remedies. He may let the wrongful foreclosure stand and ask for damages (historically an action at law with a trial by jury). Or, he may ask to have the wrongful foreclosure set aside and the situation restored which existed prior to the foreclosure (historically an equitable claim not involving any jury determination). Royall v. Yudelevit, 106 U.S.App.D.C. 1, 268 F.2d 577 (1959), and cases there cited. Since the fusion of legal and equitable claims brought about by the Federal Rules, alternative and inconsistent remedies for a wrongful foreclosure may be sought in a single action. Of course, this does not mean that there may be two recoveries for the same wrong.[7] It does mean that either party may have upon demand a jury trial of the factual issues presented in the legal claim before determination by the court of the equitable claim.
 
 
 32
 We hold that the prayer of Carroll Arms for damages for an allegedly wrongful foreclosure presented a legal claim triable of right by a jury. We likewise hold that a legal issue triable by jury was involved in the action for possession of the hotel which was instituted against Carroll Arms by National Life, as purchaser at the foreclosure. Whitehead v. Shattuck, 138 U.S. 146, 11 S.Ct. 276, 34 L.Ed. 873 (1891).[8]
 
 
 33
 Notwithstanding the existence of legal claims triable by jury, a grant of summary judgment in whole or in part may leave no material issues for a jury to try. Port of Palm Beach Dist. v. Goethals, 104 F.2d 706 (5th Cir. 1939); American Ins. Co. v. Gentile Bros. Co., 109 F.2d 732 (5th Cir. 1940). National Life and the trustees moved for summary judgment in their favor as to the relief Carroll Arms asked for in their complaint and as to the relief sought by National Life in its complaint for possession. The ground of the motion was that no genuine issues existed as to any material facts upon which said complaints were based, and that National Life and the trustees were entitled to judgment thereon as a matter of law.
 
 
 34
 THE SUMMARY JUDGMENT PROCEEDINGS AS TO USURY AND MONEY LENDERS ISSUES
 
 
 35
 At the outset we note that factual issues are not to be tried or resolved by the summary judgment procedure. Only the existence of a genuine and material factual issue is to be determined. Dewey v. Clark, 86 U.S.App.D.C. 137, 180 F.2d 766 (1950). The court "may conclude that in one or more aspects there is no genuine dispute as to the material facts and that the controlling factor is one of law." Manning v. State Farm Mutual Automobile Insurance Co., 243 F.Supp. 619, 620 (W.D.N.C.1965).
 
 
 36
 The court granted the motion for summary judgment as to the usury issue. Carroll Arms contend that this was error. We state the setting in which this contention arises.
 
 
 37
 In the loan of $1,300,000 by National Life to Carroll Arms the interest rate of 8 percent was within the legal limit. D.C.Code Sec. 28-3301 (1967 ed.). The original loan commitment made in 1965 was for $1,100,000 with interest at 6 5/8 percent. When two years later the borrower wanted to increase the amount of the loan commitment the lender regarded the loan as a full one from the standpoint of value, and as the rate market for interest had increased, the revised commitment for a loan of $1,300,000 carried an interest rate of 8 percent.
 
 
 38
 From the beginning the loan commitment which had been made by National Life to Carroll Arms provided that National Life was to be secured by a first deed of trust not only on the real estate but also on the chattels used in the hotel operation. It developed, however, that prior to the closing of the $1,300,000 loan, Carroll Arms in negotiating a purchase of certain hotel furniture, furnishings, and equipment agreed to give the vendor thereof, a firm known as StrausDuparquet, Inc. (hereafter "Straus"), a first lien thereon to secure the purchase price of said chattels. Carroll Arms could not then comply with the commitment for the $1,300,000 loan since obviously Straus and National Life could not each have a first lien on the chattels in question.
 
 
 39
 In this situation and at the instance of Carroll Arms, National Life agreed that in addition to lending Carroll Arms $1,300,000, it would purchase the note and security agreement (chattel mortgage) which Straus had received from Carroll Arms. This note was for $247,000 and carried interest at 8 percent per annum. The price paid Straus by National Life for this note and security agreement (chattel mortgage) was $190,000, the note being endorsed by Straus to the order of National Life. Carroll Arms contend that this note is usurious.
 
 
 40
 However, in the foreclosure here, National Life proceeded solely on the $1,300,000 note and deed of trust securing the same. The record indicates that no action has been taken by National Life against Carroll Arms in regard to the chattel mortgage purchased by National Life from Straus.
 
 
 41
 It appeared to the district court "on the undisputed facts that there were two separate transactions-one involving the first deed of trust principally in issue and one involving a chattel mortgage-and that as a matter of law allegations of usury on the chattel mortgage do not raise triable issues of usury concerning the deed of trust." Accordingly the court granted the motion of National Life and the trustees for summary judgment as to the usury issue.
 
 
 42
 We agree that such grant was proper. If, as claimed, the note given to Straus by Carroll Arms and later sold by Straus to National Life was usurious, still it "is settled law that a defense of usury good against one obligation will not constitute a valid offset against a distinct and independent obligation, though between the same parties." Metropolitan Loan & T. Co. v. Schafer, 44 App.D.C. 356, 372 (1916). Besides, usury "does not vitiate the loan or destroy the obligation to repay the principal." Richards v. Bippus, 18 App.D.C. 293, 304 (1901).
 
 
 43
 Royall v. Yudelevit, 106 U.S.App.D.C. 1, 4, 268 F.2d 577, 580 (1959) holds:
 
 
 44
 "A lender in a loan contract which is merely usurious may not be liable in damages. But if there is added to the situation the fact that the lender was not licensed as required by law, the loan contract is unlawful and void, and a foreclosure thereunder is wrongful and gives rise to an action for damages suffered therefrom." (Emphasis added.)
 
 
 45
 Thus, to support their claim that the foreclosure sale of the Capitol Hill Hotel was wrongful, unlawful and void, Carroll Arms contended that the licensing provisions of the Money Lenders Act apply to National Life. Although interest at 8 percent per annum is allowable in an instrument in writing,[9] it is unlawful under the Money Lenders Act for a party to engage in the business of loaning money upon security at an interest rate greater than 6 percent per annum without a license.[10] However, certain institutions are exempted from the requirements of the Act.[11]
 
 
 46
 The reliance by Carroll Arms upon an alleged violation by National Life of the Money Lenders Act is misplaced. It is undisputed that National Life at all pertinent times was licensed to do business in the District of Columbia under the Life Insurance Act. D.C.Code Sec. 35-301 et seq. (1967 ed.). As such licensee, National Life was exempt from the licensing requirements of the Money Lenders Act.[12]
 
 
 47
 While the district court, in granting summary judgment to National Life and the trustees as to the usury issue, did not specifically refer to the Money Lenders Act, the parties to this litigation assume that implicit in such grant was a determination that National Life is exempt from the provisions of the Money Lenders Act. We believe this assumption to be warranted.
 
 
 48
 The grant of summary judgment by the court as to the usury issue disposed of the claims upon which Carroll Arms grounded their first theory of a wrongful foreclosure, that is, an allegedly usurious transaction coupled with an alleged violation by the lender of the Money Lenders Act. Hence, as to this aspect of Carroll Arms' claim against National Life and the trustees for damages for an allegedly wrongful foreclosure, no legal issues were left for a jury to try.
 
 
 49
 THE SUMMARY JUDGMENT PROCEEDINGS IN RE MATERIAL FACTS INVOLVING NO GENUINE ISSUE
 
 
 50
 The disposition made by the court of the motion for summary judgment left standing the issues presented in the complaint of Carroll Arms in support of their second theory of a wrongful foreclosure. This theory is grounded on a concept that no default under the deed of trust had occurred.
 
 
 51
 When, as here, a motion for summary judgment is made and supported as provided in Rule 56, Fed.R.Civ.P., the court is required to determine whether there are material facts as to which there is no genuine issue.
 
 
 52
 We have examined with great care the entire record which was before the court on the summary judgment motion. Considerable discovery preceded the hearing. The motion was supported by documents on which the litigation was based, by affidavits, and by depositions by and on behalf of all the principal parties to the two consolidated actions. We cannot be sure that the evidentiary material in support of the motion was considered since the order on the motion recites merely that "oral argument and the memoranda in this matter" were reviewed. However, we are convinced from our study of this record that there were material facts as to which there was no genuine issue. Before we go into details in this regard, it is appropriate to refer to procedural phases of the summary judgment motion in the cases at bar.
 
 
 53
 Although the motion for summary judgment was accompanied by affidavits, depositions, and documentary evidence including the note evidencing the loan of $1,300,000 and the deed of trust securing the note, Carroll Arms and the Silvermans filed no counter-affidavits or depositions disputing the assertions in the affidavits, depositions and documents relied on by movants.
 
 
 54
 Accompanying the motion for summary judgment was a statement required under local (District Court) Rule 9(h) of the material facts as to which the moving parties contend there is no genuine issue. This rule also required that a party opposing summary judgment file a concise "statement of genuine issues" setting forth all material facts as to which such party contends there exists a genuine issue necessary to be litigated. Carroll Arms and the Silvermans failed to meet this requirement.
 
 
 55
 The local rule 9(h) specifically provides that in the absence of such statement the court may assume the truth of the facts as set forth by the moving party.
 
 
 56
 While Carroll Arms and the Silvermans filed an "opposition" to the motion for summary judgment, it consisted of a bare conclusory allegation "that there are plain and clear issues of fact." As for the statement required of them under local Rule 9(h), they relied on allegations in the pleadings, without reference to any specific part thereof as setting forth facts showing a genuine issue or issues. At the most the statement merely reflects Carroll Arms' view that the pleadings indicate there is a genuine issue of fact as to the fairness of the foreclosure advertising.[13] Two months subsequent to the filing of the motion for summary judgment, and one day prior to the hearing thereon, Carroll Arms and the Silvermans filed a supplement to their opposition to the motion. It amplified to some extent their argument but still did not furnish a concise statement of genuine issues setting forth material facts alleged to be in dispute.
 
 
 57
 Insofar as Carroll Arms and the Silvermans relied on their pleadings to create an issue or issues of fact, that course is impermissible under Rule 56(e). It provides that "an adverse party may not rest upon the mere allegations * * * of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." (Emphasis added.)
 
 
 58
 The purpose of Rule 56(e) as amended in 1963 "was to strengthen the weapon of summary judgment as a device to screen out sham issues of fact." United States v. Prince, 348 F.2d 746, 748 (2d Cir. 1965). Former Chief Justice Warren observed that under the Civil Rules "a law suit is a search for the truth and the tools are provided for finding out the facts before the curtain goes up on the trial." 38 Conn.B.J. 3 (1964). The summary judgment rule is one of the most significant of such "tools", and, if properly followed, enables the court "to separate what is formal or pretended from what is genuine and substantial, so that only the latter may subject a litigant to the burden of a trial." Becker v. Safelite Glass Corp., 244 F. Supp. 625, 631 (D.Kan.1965). But here the parties opposing the motion for summary judgment disregarded the requirement of both Rule 56(e) and local rule 9(h), thus engaging in a sort of procedural anarchy.
 
 
 59
 The second (and last) theory of Carroll Arms for claiming damages for a wrongful foreclosure was that "no sums are due the noteholder at this time, and that in any event there has been a waiver thereof," as alleged in paragraph 8 of the complaint; that National Life led plaintiffs (appellants) to believe "that adjustments would be made and were in fact to be made in the arrangements between the parties, and in this regard they did wilfully * * * misrepresent their intentions" to the end that National Life as noteholder "could obtain ownership of the plaintiffs' premises known as the Capitol Hill Hotel," as asserted in paragraph 10 of the complaint; and that as set forth in paragraph 11 of the complaint "at the time of the transactions by and between the plaintiffs, and defendant corporation in November of 1967, it was known and understood by all of the plaintiffs herein that adjustments and modifications would be made and entered into."
 
 
 60
 Jerome Silverman having sworn to the truth of the contents of the complaint filed by Carroll Arms, National Life deposed him on July 9, 1968 about a month after the foreclosure and prior to the filing of the motion for summary judgment. When inquiry was made of Mr. Silverman as to what facts he intended "to introduce in the trial of this case" to support the contentions set forth in the complaint, he replied: "I believe it is set forth in the suit, and it is more or less a legal technical matter which I am not too aware of." Asked whether he had read the pleadings prepared by his counsel, Mr. Silverman answered: "Not too thoroughly, no."[14]
 
 
 61
 Mr. Silverman's attention was directed to his assertion in paragraph 8 of the complaint that "no sums are due the noteholder at this time, and that in any event there has been a waiver thereof." Then this inquiry was made of Mr. Silverman: "Where did you get the understanding that you allege in the complaint that you filed that the noteholder would extend and was to extend sums due under the note, and would extend or waive interest that is claimed under the note?" Mr. Silverman responded: "I will have to consult my attorney on that."
 
 
 62
 Thereafter the following question was put to Mr. Silverman: "Well, do you recall any conversations with anybody about extension, with National Life Insurance Company, about extension of time within which to make your interest payments, or extension of time within which to pay the sums that were due under the note?" Answering "Yes, there was some," Mr. Silverman said he believed he "spoke to Mr. Henderson." He was then asked when and where, who else was present, and "what was said in that conversation." Mr. Silverman responded that it was in Washington in March or April of 1968, that he could not recall "right now who was present," and that there "was reference to a lease of the restaurant [of the hotel] to an operator here in town."[15]
 
 
 63
 The purport of further testimony of Mr. Silverman in this regard was that he was trying to raise money, that he desired to lease the restaurant of the hotel to an experienced restaurateur who would pay down a substantial amount on the lease, and if National Life would go along with the proposed lease Carroll Arms would agree to apply the money to be received from the restaurateur to payment of interest due National Life.[16] Mr. Silverman further testified that he never dealt directly with National Life concerning the proposed lease. Thereafter Mr. Silverman, in response to questions, stated that Mr. Simon, the attorney for Carroll Arms (as to the proposed lease), never definitely told him that National Life had agreed to go along with the lease. When asked "And as far as you know, * * * from any source that you are aware of, National Life never did agree definitely to go along with this, isn't that right?" Mr. Silverman responded: "I imagine, because the next correspondence we got from them was for the sale of the property."[17]
 
 
 64
 As to the allegations in paragraph 10 of the complaint that National Life misled the plaintiffs in that National Life misrepresented their intentions, Mr. Silverman was asked what discussions or conversations and with whom led him to make such assertions. He replied that he was referring to "the discussions by Mr. Simon with National Life in reference to the leasing of the restaurant," and that Mr. Simon had never definitely indicated to him that National Life had agreed to go along with the leasing proposal.[18]
 
 
 65
 When inquiry was made as to whether paragraph 10 referred to any conversations or discussions other than those relating to lease of the hotel dining room, Mr. Silverman stated that he had mentioned to Mr. Henderson of National Life that "the American Railroad Association was very interested in renting on a longterm lease a portion of the hotel," that he did not consider that he needed to get permission from National Life, but was keeping National Life informed of his efforts to raise money. The contemplated lease to the Railroad Association did not materialize.[19]
 
 
 66
 Mr. Silverman was asked in his deposition what he was referring to in paragraph 11 when he alleged that in November 1967 it "was known and understood by all of the plaintiffs herein that adjustments and modifications would be made and entered into." His response was that about November 1967 Carroll Arms was in a position where "we would have to go to a secondary position somewhere along the line; and we would have to have permission to do that. And he [apparently Mr. Taylor of National Life] agreed at that time that we could go out to try to get secondary financing, which we did try to do in February, I believe, or in January, right after the closing, with this New York outfit, which it didn't pan out." He further testified: "We were not allowed to get secondary financing without the permission of National Life, and they gave us permission to go out and get secondary financing. That is, this particular paragraph, what I meant." Mr. Silverman also testified that this secondary financing was all he was referring to in paragraph 11 of the complaint, that Carroll Arms negotiated with Real Estate Equities for such secondary financing but that they "backed out at the last minute."[20]
 
 
 67
 It clearly appears that the version of the facts alleged in paragraphs 8, 10 and 11 of the complaint was not supported by Mr. Silverman in his deposition, nor by any other evidence before the court on the motion for summary judgment. If the truth of the testimony of Mr. Silverman in his deposition be conceded, still it is without legal probative force in respect of any issue in the mentioned allegations. Whitaker v. Coleman, 115 F.2d 305 (5th Cir. 1940).
 
 
 68
 We hold as to the said allegations from paragraphs 8, 10 and 11 of the complaint of Carroll Arms that no genuine issue was presented as to any material fact. The District Court should have so held on the summary judgment motion of National Life and the trustees, and the evidentiary showing in support thereof. Accordingly we treat this matter as if the proper determination had been made by the court pursuant to such motion, i. e., a determination that no genuine issue was presented as to any material fact in respect of said allegations in paragraphs 8, 10 and 11 of Carroll Arms' complaint. These allegations are the ones relied upon by Carroll Arms for their second (and last) theory of a wrongful foreclosure grounded on the concept that Carroll Arms was not in default. It necessarily follows that no legal issues remained for a jury to try in regard to Carroll Arms' claim against National Life and the trustees for damages for an allegedly wrongful foreclosure premised on there being no default.[21]
 
 
 69
 THE SUMMARY JUDGMENT PROCEEDINGS IN RE MATERIAL FACTS WITHOUT SUBSTANTIAL CONTROVERSY
 
 
 70
 The summary judgment procedures of Rule 56 also contemplate in appropriate cases the entering by the court of "an order specifying the facts that appear without substantial controversy * *." Rule 56(d).
 
 
 71
 From the record in the two cases at bar the existence of material facts without substantial controversy is manifest. They should have been but were not specified in the order of the court on the summary judgment motion. The material facts without substantial controversy are:
 
 
 72
 (1) A debt of $1,300,000 was owing by Carroll Arms to National Life for a loan in that amount, said debt being evidenced by a promissory note given by Carroll Arms to National Life, and secured by a deed of trust given by the borrower to trustees and covering the Capitol Hill Hotel as well as the chattels used in and about its operation.[22]
 
 
 73
 (2) The deed of trust, Article II, Sec. 2, specifies occurrences or events which are "events of default" as that term is used in the deed of trust or the note secured by said deed of trust, and provides that upon the happening of any and every such event of default "the whole of the indebtedness then secured" by said deed of trust "shall immediately become due and payable at the option of the noteholder."[23]
 
 
 74
 (3) Prior to the foreclosure sale on June 13, 1968 Carroll Arms Associates were plainly in default under the terms of the note and deed of trust in the following particulars: (a) failure to pay interest due January 1, February 1, March 1, April 1, and May 1 in 1968, each in the amount of $8,666.67, and monthly payment of June 1, 1968 in the amount of $10,837.72; (b) failure to provide fire insurance (coverage) of $1,500,000 as requested; (c) failure to pay real estate taxes due March 1, 1968 in the amount of $4,292.35; (d) failure to pay personal property taxes; (e) failure to furnish requested financial statements or to furnish same within 90 days of year end; (f) failure to pay insurance premium on the life of Jerome Silverman due March 1, 1968; (g) failure to keep full and adequate books of account in accordance with the "Uniform System of Accounts for Hotels"; and (h) failure to make monthly deposits for tax and hazard insurance escrows of $3,100 each due January 1, February 1, March 1, April 1, May 1, and June 1, all in the year 1968.[24]
 
 
 75
 (4) Under the terms of the deed of trust each and every default mentioned in subdivision (3) hereof entitled National Life to exercise its right to foreclose pursuant to said deed of trust.[25]
 
 
 76
 (5) The deed of trust provides that upon the happening of any and every event of default the trustees are empowered to "take possession of and sell * * * the above-described property at public auction * * *, and at such time and place, upon such terms and conditions * * * and after such previous public notice, with such postponement of sale or resale, as to the said trustees shall seem appropriate; and (the terms of sale being complied with) the trustees shall convey in fee simple to and at the cost of the purchaser, the premises so sold * * *."[26]
 
 
 77
 (6) The trustees were requested by National Life to sell the property because of the defaults of Carroll Arms under the deed of trust, and the trustees did so.[27]
 
 
 78
 (7) The trustees following the foreclosure sale conveyed the property to National Life as the purchaser at such sale.[28]
 
 
 79
 On the basis of the existence of such material facts without substantial controversy the legal conclusions which flow therefrom are:
 
 
 80
 (1) By the deed of trust appellants vested the legal title to the hotel in the trustees and fully authorized them, upon default thereunder, and at the request of the noteholder thereby secured, to sell the hotel at foreclosure and to convey the legal title thereto to the purchaser.
 
 
 81
 (2) Because of the defaults of appellants in respect of their obligations under the deed of trust, the noteholder had a right to call on the trustees to foreclose.
 
 
 82
 (3) The foreclosure sale by the trustees and their conveyance of the hotel to the purchaser were pursuant to their power and duty under the deed of trust.
 
 
 83
 (4) The right to foreclose did exist, and the foreclosure was not wrongful.
 
 
 84
 (5) The conveyance of the property to National Life by the trustees vested the legal title thereto in the purchaser, National Life.[29]
 
 
 85
 We noted earlier that a legal issue triable by jury was involved in the action for possession brought by National Life after the foreclosure.[30] The material facts existing without substantial controversy and the conclusions of law flowing therefrom, as above stated, amply demonstrate that the foreclosure was not wrongful and that the legal title to the hotel which was in the trustees passed by their deed to National Life. These facts and conclusions warranted the grant of summary judgment to National Life as to its action for possession. Therefore, we shall treat the action for possession as if the court had granted the summary judgment which under the circumstances it should have granted. It follows that no material issue was left for a jury to try in respect of the action for possession.
 
 THE TRIAL
 
 86
 The two cases here came on for trial before a different judge. Upon motion the court struck the demand of Carroll Arms for a jury trial on the ground that "there were no issues raised in * * * the cases which would be subject to determination by a jury."
 
 
 87
 We recognize that the Seventh Amendment entitled Carroll Arms to a jury trial of the factual issues presented in their claim for damages for an allegedly wrongful foreclosure as well as in their challenge of the title of National Life to the property. The striking of the jury trial demand by the court would, as to such factual issues, require reversal but for the summary judgment proceedings. The purpose of the summary judment rule "is not to cut litigants off from their right to trial by jury if they really have issues to try." Sartor v. Arkansas Natural Gas Corp., 321 U.S. 620, 627, 64 S.Ct. 724, 728, 88 L.Ed. 967 (1944).
 
 
 88
 It is manifest from the detailed analysis we have already made of the evidentiary showing on the motion for summary judgment that no genuine issues were presented for a jury to try in respect of the allegations on which Carroll Arms based their claim of a wrongful foreclosure and their claim of title to the property. Therefore, even though the judge who heard the motion granted it only as to the usury issue, we treat these cases as if the summary judgment procedures had been properly applied on the basis of the adequate evidentiary showing made by National Life and the trustees, leaving no jury issues for determination at trial as to Carroll Arms' claim of a wrongful foreclosure and as to National Life's right to possession. Whitsell v. Alexander, 229 F.2d 47 (7th Cir.), cert. denied, 351 U.S. 932, 76 S.Ct. 788, 100 L.Ed. 1461 (1956).
 
 
 89
 We turn to the one remaining aspect of the jury trial controversy. It is the claim of Carroll Arms that "the good faith and the propriety of the action of the trustees" were jury issues.[31]
 
 
 90
 At pretrial, Carroll Arms augmented their former assertions challenging the good faith and propriety of the action of the trustees, the foreclosure sale having been accomplished subsequent to the filing of Carroll Arms' complaint. In essence these allegations are that the trustees were not impartial, that the notice given by them of the sale was not sufficiently extensive, and that the price for which the property was sold was inadequate.[32]
 
 
 91
 It is worthy of note that foreclosures are not modern devices. As early as 1625 during the reign of King Charles I the English Court of Chancery exercised inherent power to order a sale of mortgaged premises. Federal Title & Mortgage Guaranty Co. v. Lowenstein, 113 N.J.Eq. 200, 166 A. 538 (1933). In the United States foreclosures traditionally have been carried out through suits in equity.[33]
 
 
 92
 The foreclosure process in the District of Columbia has been simplified by giving a power of sale to trustees in a deed of trust and effecting the foreclosure by means of a trustee's sale under such power. Deeds of trust "have grown into almost universal use under the permission and encouragement of the law, as a ready means of effecting loans;" and as long as they "are entered into by permission of law, they must be respected and not interfered with, unless upon some well recognized principle of equity * * *." (Emphasis added.) Anderson v. White, 2 App.D.C. 408, 417 (1894).
 
 
 93
 In Spruill v. Ballard, 61 App.D.C. 112, 114, 58 F.2d 517, 519 (1932), an equity case, we said: "The ease and facility of foreclosure under [a deed of trust] commends it over the more cumbersome form of mortgage which must be foreclosed in court, but this very fact imposes upon courts the duty of scrutinizing all sales had under it which are questioned, and of setting those aside in which fraud or overreaching has been practiced by the trustee."
 
 
 94
 The duty of trustees in deeds of trust "is to sell after default, upon the demand of the security holder in the manner and upon the notice prescribed in the trust. They cannot sell upon holidays, or at unusual or unreasonable hours; but they have no right, on the other hand, to refuse to sell until some time in the future that may be more satisfactory or advantageous to the mortgagor. Appeals for delay to a more favorable or convenient season must be made to the creditor. The terms of the instrument measure the powers and prescribe the duties of the trustees." Anderson v. White, supra, 2 App.D.C. at page 419. Trustees under deeds of trust also have the duty to act for the benefit of both parties, borrower as well as lender, and to be impartial. Sheridan v. Perpetual Building Association, 112 U.S.App.D.C. 82, 299 F.2d 463 (1962).
 
 
 95
 It is by the standard long ago established for trustees generally that the conduct of trustees under a deed of trust is measured.[34] The same good faith is required of trustees under a deed of trust of real estate as is required of other fiduciaries. Brown v. Oriental University, 44 App.D.C. 414 (1916).
 
 
 96
 Turning to the law of trusts, in general the remedies of a beneficiary against a trustee are equitable. "The creation of a trust is conceived of as a conveyance of the beneficial interest in the trust property rather than as a contract. Moreover, questions of the administration of trusts have always been regarded as of a kind which can adequately be dealt with in a suit in equity rather than in an action at law, where questions of fact would be determined by a jury and not by the court." Restatement (Second) of Trusts, Sec. 197, comment b (1959).
 
 
 97
 Claims of the nature here made against the trustees as to the propriety of their actions were consistently treated as equitable during more than a century antedating the 1938 merged procedure created by the Federal Rules. Newman v. Jackson, 12 Wheat. 570, 6 L. Ed. 732 (1827); Clark v. Trust Co., 100 U.S. 149, 25 L.Ed. 573 (1879); Smith v. Black, 115 U.S. 308, 6 S.Ct. 50, 29 L.Ed. 398 (1885); Anderson v. White, 2 App.D.C. 408 (1894); Mut. Fire Insurance Co. of Dist. of Columbia v. Barker, 17 App.D.C. 205 (1900); Holman v. Ryon, 61 App.D.C. 10, 56 F.2d 307 (1932); Spruill v. Ballard, 61 App.D.C. 112, 58 F.2d 517 (1932); Ballard v. Spruill, 64 App.D.C. 60, 74 F.2d 464 (1934); Stokes v. Hinden, 66 App.D.C. 34, 85 F.2d 200 (1936); Hotel Lafayette v. Pickford, 66 App.D.C. 211, 85 F.2d 710 (1936); Jackson v. Fuller, 66 App.D.C. 239, 85 F.2d 816 (1936).
 
 
 98
 Questions as to the adequacy of prices realized for property at foreclosures were for resolution by equity courts. "Unless the price at which the property was sold was so grossly inadequate as to shock the conscience of the chancellor and raise a presumption of fraud, the sale must stand." Cromer v. DeJarnette, 188 Va. 680, 51 S.E.2d 201, 204 (1949). See also Clark v. Trust Co., 100 U.S. 149, 152, 25 L.Ed. 573 (1879). Whether the notice of the foreclosure sale was sufficient, whether the trustees exercised their independent judgment and if not, the effect thereof on the ultimate fairness of the sale, were issues determind in equity. Hotel Lafayette v. Pickford, 66 App.D.C. 211, 214, 215, 85 F.2d 710, 713, 714 (1936). An inquiry as to whether the foreclosure sale was made in good faith by the trustees was one cognizable in equity. Brown v. Oriental University, 44 App.D.C. 414 (1916). Whether trustees under a deed of trust had a conflict of interest was decided by an equity court. Holman v. Ryon, 61 App.D.C. 10, 56 F.2d 307 (1932).
 
 
 99
 Adopted in 1791, the Seventh Amendment preserves the right of trial by jury in civil matters as it then existed in England. But not all civil matters are triable by jury. Issues in suits in equity were not tried to a jury unless the chancellor in his discretion sent an issue to a jury for an advisory verdict.[35]
 
 
 100
 We hold the issues raised here as to "the good faith and the propriety of the action of the trustees" to be equitable, and not triable of right by a jury. While the Federal Rules destroyed "Purely procedural impediments to the presentation of any issue by any party, based on the difference between law and equity," Ross v. Bernhard, 396 U.S. 531, 539, 90 S.Ct. 733, 739, 24 L.Ed.2d 729 (1970), they retain "a distinction between jury and nonjury issues and [leave] substantive rights unchanged." Beacon Theatres v. Westover, 359 U.S. 500, 509, 79 S.Ct. 948, 955, 3 L.Ed.2d 988 (1959).
 
 
 101
 The trial court concluded that the trustees performed their duties at all times in good faith, that the advertisement of the sale was sufficient in all respects, including description of the property, nature and extent of notice and media of publication, that the foreclosure sale was fairly conducted by the trustees in accordance with the terms of the deed of trust, and the law and practice prevailing in the District of Columbia as to foreclosure sales. Further, the court concluded that the $900,000 bid at the sale "was not insufficient in amount so as to constitute a legally inadequate price." We agree with these conclusions.
 
 
 102
 We find without merit the contention of Carroll Arms that the trial court failed to apply the proper standard to its fact-finding functions, and "to make the proper shifts in the burden of persuasion." They maintain that the court should have placed upon the defendant trustees the burden of proving that they were faithful to their trust. But in this regard the teaching in Sheridan v. Perpetual Building Association, 112 U.S.App.D.C. 82, 299 F.2d 463 (1962) is that "when it is shown that a fiduciary has conflicting interests, ancient principles require him to bear the burden of proving that he has been faithful to his trust." 112 U.S.App.D.C. 84, 299 F.2d 465. No showing was made by Carroll Arms that the defendant trustees had conflicting interests or that there was any improper conduct on their part. From the record we believe that they acted with fairness[36] to all concerned.
 
 
 103
 Affirmed.
 
 On Reconsideration En Banc
 
 104
 Before BAZELON, Chief Judge, and WRIGHT, McGOWAN, TAMM, LEVENTHAL, ROBINSON, MacKINNON, ROBB and WILKEY, Circuit Judges, sitting en banc.
 
 PER CURIAM:
 
 105
 The circumstances surrounding this case are adequately outlined in the panel opinion. We granted reconsideration en banc limited to the question whether the claim of the debtor Carroll Arms for a money judgment for damages arising from the improper execution of the foreclosure sale of the property in suit required a jury trial. We find that it does.
 
 
 106
 The teaching of Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959), and Dairy Queen, Inc. v. Wood, 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962), is that in determining whether a claim is to be tried by a jury we look to the remedy. If there is a remedy at law, the Seventh Amendment provides the right to a jury trial. Thus in Dairy Queen, even though the remedy sought was an injunction for trademark infringement and an accounting for past infringements, the Court held that the "accounting" was essentially a claim for money damages, that the law was adequate to provide such a remedy, and that consequently a jury trial was required.
 
 
 107
 We find Beacon Theatres and Dairy Queen dispositive here.[1] Carroll Arms contends that the trustees were not impartial, that they negligently abused their discretion in that the notice given by them of the sale was not sufficiently extensive, and that therefore the price for which the mortgagee bought in the property was inadequate. It asks for money damages arising from the bad faith and improper actions of the trustees. It also asks for a jury trial.
 
 
 108
 As the panel opinion in this case indicates, where the right to foreclosure is the issue, the debtor may sue the trustee in equity to set the foreclosure aside or in law for damages, allowing the foreclosure to stand. See, e. g., Royall v. Yudelevit, 106 U.S.App.D.C. 1, 268 F.2d 577 (1959); Burnett v. Dunn Commission & Supply Co., 180 N.C. 117, 104 S.E. 137 (1920); Garrett v. Crawford, 128 Ga. 519, 57 S.E. 792 (1907); Dennett v. Codman, 168 Mass. 428, 47 N.E. 131 (1897). But where, as here, only the manner in which the foreclosure was executed is the issue, the cases are confused and conflicting. Thus, while there is authority to the effect that an action for damages will lie for an improper execution of a rightful foreclosure, see, e. g., Fenton v. Torrey, 133 Mass. 138 (1882); Lowell v. North & Carll, 4 Minn. 15 (1860); Federal Land Bank of New Orleans v. Robinson, 160 Miss. 546, 134 So. 180 (1931); 3 L. Jones, Mortgages Sec. 2456 (8th ed. 1928), the contrary view has also been taken, at least in the absence of a preconceived plan to carry out a fraudulent purpose, see, e. g., Dawson v. Hayden, 67 Ill. 52 (1873); Leavitt v. Files, 38 Kan. 26, 15 P. 891 (1885); Peterson v. Kansas City Life Ins. Co., 339 Mo. 700, 98 S.W.2d 770 (1936). See generally Annot., 108 A.L.R. 592 (1937).[2]
 
 
 109
 We are persuaded that the need for a remedy at law in damages is just as great where the debtor has been injured by improper execution as by wrongful foreclosure. A mere right to set aside the sale, without an alternative damage remedy, would in many instances fail to afford adequate protection to the injured debtor. For example, where the land depreciates in value between the time of the improperly executed foreclosure and the termination of the debtor's suit, a right simply to set aside the sale does not restore to the debtor what he has lost. Similarly, if an innocent purchaser is involved, the courts have been reluctant to set the sale aside and the debtor may be left without any effective remedy. See, e. g., Canelacos v. Hollway, 75 U.S.App.D.C. 58, 123 F.2d 934 (1941); Dugan v. Manchester Federal Savings & Loan Ass'n, 92 N.H. 44, 23 A.2d 873 (1942); Fountain v. Pateman, 189 Ala. 153, 66 So. 75 (1914).
 
 
 110
 Given these considerations, we conclude that the debtor may bring an action at law against the trustees, and those in complicity with them, for damages for breach of trust in the execution of the foreclosure, and that the debtor is entitled to a jury determination on this issue.[3]
 
 
 111
 So ordered.
 
 
 
 *
 Sitting by designation pursuant to Title 28, U.S.Code, Section 294(c)
 
 
 [1]
 The deposit specified in the initial advertising was $100,000 while in the deed of trust it was fixed at $25,000 or 2 percent of the unpaid principal indebtedness then secured by the deed of trust, whichever was greater
 
 
 [2]
 On June 12, 1968 (the day preceding the foreclosure) Carroll Arms moved for leave to file a supplemental complaint which was attached to the motion as an exhibit. Such leave was granted, and on July 31, 1968, said exhibit was marked filed as the supplemental complaint. It alleges additional facts but asks for the same relief as the original complaint (both of which relate to times preceding the foreclosure). The references in the opinion to the complaint relate to the so-called supplemental complaint which in itself is an amended complaint
 
 
 [3]
 "[I]n case of a sale of real estate under * * * deed of trust * * *, and a conveyance thereof to the purchaser, the grantor in such * * * deed of trust, * * * shall be held and construed to be tenants at will * * *" D.C.Code Sec. 45-822 (1967 ed.)
 
 
 [4]
 The notice for termination of a tenancy at will is set forth in D.C.Code Sec. 45-903 (1967 ed.)
 
 
 [5]
 "In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law." U.S.Const. amend. VII. See also Rules 38, 39, Fed.R.Civ.P
 5a 1 Glenn, Mortgages Sec. 103 at page 630 (1943) states: "But unless an unlawful foreclosure is shown, no tort action can be based upon a claim of conspiracy."
 
 
 [6]
 Complaint, par. 16
 
 
 [7]
 1 Glenn, Mortgages Sec. 103.2, pp. 632, 633 (1943)
 
 
 [8]
 Whitehead v. Shattuck, supra, was a suit in equity to quiet title which was dismissed on the ground that a complete and adequate remedy at law existed. Mr. Justice Field for the court commented that "where an action is simply for the recovery and possession of specific real * * * property * * * the action is one at law." And "in a contest over the title both parties have a constitutional right to call for a jury." 138 U.S. 151, 11 S.Ct. 277
 
 
 [9]
 D.C.Code Sec. 28-3301 (1967 ed.)
 
 
 [10]
 Id. Sec. 26-601
 
 
 [11]
 Id. Sec. 26-610(a)
 
 
 [12]
 "Nothing contained in this chapter shall be held to apply to the legitimate business of national banks, licensed bankers, trust companies, savings banks, * * * or to life insurance companies." (Emphasis added.) D.C.Code Sec. 26-610(a) (1967 ed.)
 
 
 [13]
 The Rule 9(h) statement of appellants is as follows: "At the very least, it is apparent from the pleadings themselves that the foreclosure action here is asserted to be unfair in its advertising and pursuant to [unspecified] fraudulent actions; it is therefore alleged to be illegal and wrongful. At the very least, and putting aside all other matters, that raises a genuine issue of fact. That fact forms the basis of the propriety of the foreclosure."
 
 
 [14]
 Deposition of Jerome Silverman, p. 76
 
 
 [15]
 Deposition of Jerome Silverman, pp. 77, 78
 
 
 [16]
 This proposed lease is also discussed in the deposition of Andrew R. Field, pp. 55-59, Field being a representative of National Life. He testified that Mr. Simon, attorney for Carroll Arms, told him that a condition of the proposed lease was that the first deed of trust held by National Life be subordinated to said lease; that he (Field) did not encourage Simon to continue negotiating as it would be just not palatable for National Life to subordinate its first trust to the proposed lease. Field further testified that the amount the proposed tenant would put up was not enough to cure the delinquency of Carroll Arms on the loan; and that the sum to be so put up was in the nature of a security deposit which the proposed tenant might reclaim
 
 
 [17]
 Deposition of Jerome Silverman, p. 92
 
 
 [18]
 Deposition of Jerome Silverman, p. 90
 
 
 [19]
 Id. p. 93
 
 
 [20]
 Deposition of Jerome Silverman, pp. 97-98
 
 
 [21]
 (a) No genuine issue existed in regard to the alleged "waiver" by National Life of payments due fom Carroll Arms. (b) No genuine issue existed in regard to alleged misrepresentation by National Life. (c) No genuine issue existed in regard to an alleged understanding as to future adjustments and modifications to be made respecting the loan transaction
 
 
 [22]
 Supplemental Affidavit of Andrew R. Field filed in C.A. No. 1215-68 on August 7, 1968, pars. 2, 3, and Exhibit 1 (Deed of Trust) and 2 (note) thereto attached
 
 
 [23]
 Exhibit 1 (Deed of Trust) attached to the Supplemental Affidavit of Andrew R. Field filed in C.A. No. 1215-68, Aug. 7, 1968, Art. II, Sec. 2
 
 
 [24]
 Supplemental affidavit of Andrew R. Field filed Aug. 7, 1968, par. 4, and Exhibit 1 (deed of trust) attached thereto, Art. III, Secs. 1, 2, 3, 5, 9(b), 9(d) and 20. See also: Exhibit 2 (note) attached to said affidavit; and the Silverman deposition, pp. 107-112
 
 
 [25]
 Exhibit 1 (deed of trust) attached to supplemental affidavit of Andrew R. Field filed Aug. 7, 1968, Art. II, Sec. 2. Art. III, Secs. 1, 2, 3, 5, 9(b), 9(d) and 20. Silverman deposition, pp. 107-112
 
 
 [26]
 Exhibit 1 (deed of trust) attached to supplemental affidavit of Andrew R. Field filed Aug. 7, 1968, Art. II, Sec. 2
 
 
 [27]
 Deposition of Robert W. Kidwell, p. 135. Deposition of Andrew R. Field, pp. 63-65
 
 
 [28]
 Exhibit 4, attached to the supplemental affidavit of Andrew R. Field filed Aug. 7, 1968
 
 
 [29]
 In Newman v. Jackson, 12 Wheat. 570, 571, 6 L.Ed. 732 (1827) the Supreme Court held that "the conveyance of the trustee was a sufficient title at law to enable his alienee to recover in the action of ejectment." See also Williams v. Jackson, 107 U.S. 478, 482, 2 S.Ct. 814, 27 L.Ed. 529 (1882); [6, 7] of Ballard Bros. Fish Co. v. Stephenson, 49 F.2d 581, 585 (4th Cir.) cert. denied, 283 U.S. 864, 51 S.Ct. 656, 75 L.Ed. 1468 (1931); 41 C.J. Mortgages Sec. 1467 and cases there cited. Notwithstanding the vesting of the legal title in the purchaser at a trustee's sale, upon an adequate showing of conduct on the trustee's part affecting the fairness of the sale, an equity court might set the sale aside and order a resale or other equitable relief. Clark v. Trust Co., 100 U.S. 149, 25 L.Ed. 573 (1879)
 
 
 [1]
 Glenn, Mortgages Sec. 20, pp. 127, 128 (1943) states: "As to the purchaser at the trustee's forcelosure sale * * * [h]e receives all the title * * * that the mortgagor enjoyed, and * * * can recover in ejectment against the mortgagor and those claiming through him * * *. If that had not been so, this form of security would have died aborning * * *."
 
 
 [30]
 On the day Carroll Arms answered National Life's complaint for possession in the Landlord and Tenant Branch of the District of Columbia Court of General Sessions the case was labeled "Jury Action" and placed on the "Ready for Trial Calendar." The denial of title in National Life in the answer of Carroll Arms, however, halted the proceeding as the court had no jurisdiction to try title. There is no counterclaim denoted as such in this case. Carroll Arms asserted in their answer that the Landlord and Tenant Court "cannot entertain counterclaims when rent is not sought (Rule 4)" but they prayed the court to defer or enjoin the proceeding pending the determination of the District Court action which Carroll Arms had previously filed, or alternatively to authorize the incorporation and adjudication in the Landlord and Tenant Court of the matters alleged in the District Court complaint. There was no implementation of these prayers unless consolidation of the two actions be so considered (following the certification to District Court of the action for possession)
 
 
 [31]
 Transcript of June 26, 1969, p. 9
 
 
 [32]
 At pretrial, Carroll Arms alleged that the trustees "proceeded over their objections," refused to postpone the sale, "failed to make any inquiry or be concerned with any of the contentions of Carroll Arms," "did not exercise their independent judgment or discretion," "acted under the express direction" of the attorney for National Life, "violated their fiduciary duty," "were in a conflict of interest," knew that the property involved "a national market which required * * * extensive advertising, well beyond that which was provided," that "in these respects and in all other respects" they violated the duty cast upon them "by the law and by their obligations"; and that "the property foreclosed upon * * * for $900,000" was worth in excess of Three Million
 
 
 [33]
 1 Glenn, Mortgages Secs. 77, 77.1 (1943)
 
 
 [34]
 1 Glenn, Mortgages Sec. 20.1, p. 130 (1943)
 
 
 [35]
 James, Right to a Jury Trial in Civil Actions, 72 Yale L.J. 655 (1963)
 
 
 [36]
 It should be noted that we deal in this case with parties who were well represented by counsel throughout the events which gave rise to these proceedings. We would, of course, scrutinize more carefully the fairness of a trust agreement entered into between uncounselled parties of unequal bargaining power. We would also apply the same standard to the action of the trustees in foreclosure proceedings under similar circumstances. See Williams v. Walker-Thomas Furniture Co., 121 U.S.App.D.C. 315, 350 F.2d 445 (1965)
 
 
 [1]
 See also Ross v. Bernhard, 396 U.S. 531, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970), in which the Court held that a stockholders' derivative suit, though an equitable action, is entitled to a jury trial, at least with respect to those issues as to which the corporation suing on its own would have been
 
 
 [2]
 The authorities on this subject are also collected in J. Pomeroy, Equity Jurisprudence (5th ed. 1941), in the footnotes to Sec. 995b. Pomeroy makes no distinction between actions based on wrongful foreclosure and improper execution. He recognizes a right to a suit at law for damages in both instances. Section 995b of his treatise reads:
 "Sec. 995b.-Duties of Trustee-Conduct of Sale.-The duties of the trustee of a deed of trust require the utmost good faith and impartiality as regards both the debtor and the creditor. He is personally liable, in a suit at law for damages to the party aggrieved, for a failure to use reasonable diligence, or an abuse of his discretionary powers; and a sale may be enjoined or set aside at the instance of the injured party. * * *"
 (Emphasis added; footnotes omitted.)
 
 
 [3]
 In deciding that appellants are entitled to a jury trial, we do not, of course, preclude the possibility of a disposition of this issue under Rule 56, Fed.R.Civ.P., depending on the state of the record on remand